[Civ. No. 59254. Second Dist., Div. Four. Sept. 19, 1980.]

GEORGE DEUKMEJIAN, as Attorney General, etc., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
FRED WILLIAM GABOURIE et al., Real Parties in Interest.

**COUNSEL**

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Sharlene A. Honnaka and William R. Weisman, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Robert E. Courtney, Robert L. Shapiro, Richard G. Hirsch, Richard G. Sherman, Weitzman & Fidler, Weitzman, Fidler & Re, Howard L. Weitzman, Larry P. Fidler and Donald M. Re for Real Parties in Interest.

**OPINION**

**FILES, P. J.**—This is a proceeding in mandate brought by the Attorney General to review an order of the respondent superior court made April 14, 1980, recusing the entire office of the Los Angeles County District Attorney from further participation in a prosecution under an indictment filed January 14, 1980.

Our examination of the motions to recuse, the supporting declarations, and the grand jury transcript satisfy us that the respondent court's order was an abuse of discretion and must be set aside.

The defendants named in the indictment are a municipal court judge, Fred Gabourie, a municipal court clerk, Joseph Eggleston, and two attorneys, Harry Weiss and Sammy Weiss. The indictment charges in count I, a conspiracy by all four defendants to obstruct justice (Pen. Code, § 182, subd. 5), count II, alteration of public records by Judge Gabourie and Eggleston (Gov. Code, § 6200) and count III, theft or alteration of a public record by Harry Weiss (Gov. Code, § 6201).

STANDING.

■ The effect of the respondent court's order was to thrust the burden of prosecution upon the Attorney General, who is required by statute to take charge of the case or employ special counsel when the district attorney is disqualified. (See Gov. Code, §§ 12550, 12553.) The Attorney General, therefore, has standing to seek review of the respondent court's order by a mandate proceeding in this court. (See *Younger* v. *Superior Court* (*Warren*) (1978) 77 Cal.App.3d 892, 894, fn. 1 [144 Cal.Rptr. 34].)

EVENTS PRECEDING INDICTMENT.

In order to present the issue in context it is necessary to outline events from which the underlying prosecution arose. Since the quantum of the evidence of guilt of the defendants has no bearing on the decision here, we need not recite that evidence in detail.

On March 23, 1978, a man named Viviano was arrested in Los Angeles for driving under the influence of alcohol in violation of Vehicle Code section 23102, and released on his own recognizance. Inasmuch as Viviano had been convicted of this kind of offense in 1975, he faced the prospect of a mandatory jail term and suspension of his driver's license for one year.[1] Upon the recommendation of a bartender Viviano went to the law office of Harry and Sammy Weiss. At the first interview Sammy Weiss told Viviano he would not go to jail or lose his license or be required to attend a school, and the case would not appear on his record for insurance purposes. The fee was to be $2,500 to $3,500.

Viviano then consulted with another attorney, Von Wittenburg, who told him that the promises made by Weiss were "not obtainable" and suggested that he contact the district attorney. An investigator from the district attorney's office interviewed Viviano in Von Wittenburg's office and then asked Viviano if he would be willing to cooperate in recording conversations with the Weisses. Viviano agreed, and from time to time thereafter he recorded conversations with Sammy and Harry Weiss by means of a tape recorder concealed on his person or attached to his telephone.

---

[1] See Vehicle Code sections 23102, 13352.

On April 25, 1978, Viviano went to the Weiss office to complete arrangements for representation. Sammy Weiss said that he had reviewed the record and found the intoxication level was "very high" and that the fee would be $3,500. He explained that the West Los Angeles court, where the case was pending, "was a very difficult one to work with."

On May 9, Viviano paid to the Weiss office $500 which had been given to him by the district attorney's investigator. Later another $500 payment was made to the Weiss office with county money.

On April 28, 1978, a plea of not guilty was entered for Viviano in the West Los Angeles court. Viviano was not personally present in court then or at any time thereafter. On September 26, 1978, a bench warrant was issued because of Viviano's failure to appear for trial on that day.

Judge Gabourie sat temporarily in Division 93 in the West Los Angeles court for the last week in October 1978. Joseph Eggleston, who had been his courtroom clerk since 1976, was with him. The record of the Viviano case shows that on October 27, 1978, in Division 93, with Judge Gabourie presiding, the bench warrant was recalled and the case was continued to November 3, in Division 13, which was a civil trial division in the downtown courthouse where Judge Gabourie was regularly assigned.

On November 2, 1978, Sammy Weiss advised Viviano "everything's under control...its out of there."

On November 30, 1978, Sammy Weiss instructed Viviano to bring in the "fine money," which would be $350. On December 14, 1978, Viviano delivered to the Weiss office that amount, which had been supplied by the county. Since that time Viviano has heard nothing from the Weisses concerning the status of the case.

When the Viviano case was transferred out of the West Los Angeles court on October 27, 1978, no record of that event was left behind. The reporter who was in Division 93 that day had no notes of any proceeding in that case. The deputy city attorney who was acting as prosecutor in that department was not aware that anything had happened. The clerk was unable to find the file or the docket sheet.

The city attorney's office learned where the file was when a request for a deputy was received on June 6, 1979, from division 119, located in Encino, where Judge Gabourie then presided. On June 7 there was a hearing at which, according to the court file, a guilty plea was entered for Viviano. There were five more continuances prior to November 6, 1979. The grand jury proceedings were then in progress, and the record does not show what, if anything, happened in People v. Viviano on or after November 6.

### Motions to Recuse.

The indictment was returned on January 14, 1980. Each of the defendants filed a written motion to recuse the district attorney. The Gabourie motion was made upon the ground that "a real or apparent conflict of interest exists which would prejudice the district attorney's office from exercising impartial judgment in this prosecution and thereby undermine the proper administration of justice." The supporting argument referred to the political activities of some of the district attorney's deputies, and the fact that two of the six persons running against Judge Gabourie in the June 1980 primary were deputy district attorneys.

The written argument of counsel also asserted that the deputy district attorney who had presented the case to the grand jury had demonstrated a lack of impartiality and an excess of zeal, in that, among other things he had mentioned "Watergate."

The notice of motion on behalf of Sammy and Harry Weiss did not state any grounds, but the supporting declaration of counsel described the political activities of some deputies commencing in 1975.

The notice of motion on behalf of Joseph Eggleston did not state the grounds of the motion, but the supporting argument was based upon the 1980 June primary, in which two deputy district attorneys were candidates opposing Judge Gabourie.

The Attorney General and the district attorney each filed written opposition to the motions, which contributed no new facts except to point out that only a very few of the 550 deputies in the district attorney's office had been identified as active in judicial elections.

## Respondent Court's Decision.

The motions to recuse were orally argued and decided upon the papers on file, including the grand jury transcript. The oral argument is not before us, but the record here does include the respondent court's announcement of its decision and its reasons therefor.

The respondent court said: "Now, all of these documents which you filed, and most of this discussion has related to the request for disqualification of the D.A. on the theory that it has something to do with this election. And I suppose, taken by itself, if there wasn't anything else connected with this matter at all, that I was concerned with, I would say that that wasn't sufficient. But what does concern me is the fact that, being a stranger almost to this kind of proceeding, I get the uncomfortable feeling, in reading this transcript, that there is something the matter with the relationship between the district attorney's office, as a whole, and the Weiss law firm. And, taken out of context, I would suggest to you that somebody unconnected with whatever this strange relationship is between the district attorney's office and the Weiss office would have read or heard these statements and thought nothing of them."

We agree with the respondent court that the political activity of certain deputies does not call for disqualification of the entire office. It is indisputable that deputy district attorneys are entitled to express their individual views on political issues and, like other members of the bar, to seek election to judicial office. There is no showing that the district attorney encouraged or approved of any of the activities described by the moving parties. There is no showing that any of the deputies who were running for office, or who had publicly expressed their views with respect to judicial candidates had had anything to do with the prosecution of the four persons who were indicted. There is no reason to suspect that the district attorney or the members of his staff who were active as supervisors or otherwise in procuring the indictment were at all influenced by the view point or personal ambitions of the deputies who had become involved in judicial elections.

The leading case on recusing prosecutors, *People* v. *Superior Court* (*Greer*) (1977) 19 Cal.3d 255, 269 [137 Cal.Rptr. 476, 561 P.2d 1164], established the discretionary power of a trial court "to disqualify a district attorney from participating in the prosecution of a criminal charge when the judge determines that the attorney suffers from a con-

flict in interest which might prejudice him against the accused and thereby affect, or appear to affect, his ability to impartially perform the discretionary functions of his office."

The *Greer* case was a prosecution for murder. A member of the district attorney's staff, who worked in the office where the case was being prepared, was the mother of the victim and the former mother-in-law of one of the defendants. The mother's personal grief was well known to her fellow workers. The prosecution's case involved proof a protracted child custody dispute between the victim and the defendant, and the victim's mother was expected to testify for the prosecution at the trial. There was also a contested child guardianship proceeding then pending between defendant and the victim's mother.

Under those circumstances, the *Greer* court concluded: "...It was within the bounds of the court's discretion to determine that the prosecutor might at least appear to have an emotional stake in the case of the sort which could disturb his exercise of impartial judgment in pretrial and trial proceedings." (19 Cal.3d at p. 270.)

No comparable emotional or other stake is to be expected in a district attorney's office when a few deputies out of 550 have expressed an interest in judicial elections.

*Younger* v. *Superior Court, supra,* 77 Cal.App.3d 892, arose out of a special situation which must be distinguished from that presented here. That case arose because Cochran, a member of a law firm which had a heavy criminal defense practice, was appointed assistant district attorney of Los Angeles County, the third ranking position in that office. Cochran's duties included policy making and supervision over a substantial segment of the cases in the office, recruitment, employment and promotion of attorneys, and supervision over the special investigations division. The appellate court held that the trial court did not abuse its discretion in recusing the entire office of the district attorney from prosecuting any of the persons which either Cochran or his former law firm had represented. The wide scope of Cochran's authority over the district attorney's operations as a whole made this result necessary to avoid the appearance of possible impropriety. In the present case no such appearance arises from the activity of a few deputies who have no supervisory or policy making functions.

■ The record made here amply supports the trial court's conclusion that the pending election and the politics of a limited number of deputies did not call for disqualification of the entire office. (See *In re Charles L.* (1976) 63 Cal.App.3d 760, 764-765 [132 Cal.Rptr. 840]; *People* ex rel. *Younger* v. *Superior Court* (*Rabaca*) (1978) 86 Cal. App.3d 180 [150 Cal.Rptr. 156]; *People* v. *Municipal Court* (*Henry*) (1979) 98 Cal.App.3d 690 [159 Cal.Rptr. 639].)

The reasons given by the respondent court for recusing the district attorney in this case cannot be described except by quoting the words used by the judge. After expressing his "uncomfortable feeling...that there is something the matter with the relationship between the District Attorney's office, as a whole, and the Weiss law firm," the judge quoted several bits of testimony in the grand jury transcript, with his interpretations. He stated that "VonWittenberg's situation" supported his belief "that this is a peculiar relationship" between the district attorney's office and the Weiss office. The court said: "Now the other things I don't like about this matter is that we have the District Attorney starting out in April of 1978 and working on this matter through the District Attorney's investigators, continuously for one-and-one-half years."

The judge then commented on the "very good selling job by Mr. Brenner in his closing argument [to the grand jury]."

The judge stated, "I am just telling you that I believe there are exculpatory matters referred to. They were never suggested to the grand jury." Without indicating what exculpatory matters he had in mind, the judge added:

"So that I have the feeling that, actually, after having read all this, anybody could read it, as disinterested as I am in the matter, and come up with the ultimate conclusion that to have the District Attorney representing the People in this case is, in a sense, giving the District Attorney an opportunity to pull its own coals out of the fire. The District Attorney in this matter, if it continues, will simply be representing the District Attorney, not the People who are interested in whether or not these parties committed crimes...."

### Comment and Conclusion.

The grand jury transcript as we read it, contains no evidentiary basis for the suspicions expressed by the trial court judge. The story starts

with an attorney, experienced in the defense of criminal cases, representing to a prospective client, Viviano, that he can save Viviano from the jail term and license suspension which the Vehicle Code prescribes for a person convicted of a second offense of driving under the influence. There was no discussion of guilt or innocence when the representation was made. Viviano testified that he consulted another attorney because he thought Weiss' $3,500 fee was high—a not improbable explanation. Nothing in the record suggests that Von Wittenburg had any special relationship with either the district attorney or the Weiss office, or that he knew of any special relationship between the latter two. The duty of a law enforcement officer upon hearing Viviano's story was clear enough. Unless Sammy Weiss was attempting to collect $3,500 under false pretenses, he was offering to achieve a result which could not be obtained by lawful means. Investigation was warranted. How much time the district attorney's staff spent investigating the Weisses is not in the record, but the elapsed time from beginning to end was a function of the Weisses astonishing ability to keep a simple case out of court. The fact that the district attorney conducted an investigation and presented the evidence to the grand jury is no basis for suspecting either personal bias or some improper "relationship" between the district attorney and the Weiss office. The only relationship shown by the record is the normal conduct of a prosecutor investigating persons suspected of crime. There is no evidence that the district attorney's office had any need "to pull its own coals out of the fire" or interest in this case other than the normal and proper interest of a prosecutor who has reason to suspect a conspiracy to obstruct justice. It is noteworthy that the judge conceded that in his view the evidence submitted to the grand jury was sufficient to support the indictment.[2]

The comment of the judge concerning Deputy District Attorney Brenner's "selling job" to the grand jury contains an implication not borne out by the record. The grand jury transcript contains about 800 pages of testimony taken over a 30-day period. Much of the testimony came from personnel of the municipal court and the city attorney's office describing how the court functioned and how records were kept. This tedious detail was presented as circumstantial evidence tending to show that records had been stolen and altered as alleged in counts II and III of the indictment, and that the persons named therein must

[2]The transcript of the court's remarks includes this: "Now, I am going to invite the defendants not to make a 995 motion on the indictment itself, for two reasons. One I would deny it."

have done it. After all of the evidence had been received Deputy District Attorney Brenner addressed the grand jury to review this material and point out the inferences which might be drawn. The presentation appears to have been unemotional and factual except for the prosecutor's brief comment that those who hold positions of authority are not above the law. It is in this context that the passing reference to "Watergate" is found. Neither the length of his summation nor its content can reasonably be read as indicating any improper bias or improper relationship or a withholding of exculpatory matters.

The declaration of Attorney Richard G. Sherman offered in support of the motion to recuse asserts that the office of the district attorney "has a bias against Harry Weiss which has been in existence for several years because of their frustration with Mr. Weiss relating to a case in which he represented a Dr. Flack. There was considerable effort by the district attorney's office to involve Mr. Weiss in that case by such means as the attempted intimidation of witnesses."

The Sherman declaration did not state any facts from which a continuing bias on the part of the present district attorney and his staff might be inferred. Taken by itself, the reference to Dr. Flack was nothing more than a general accusation by a partisan not shown to have any knowledge of the facts.

However, this reference appears to have carried some other significance to the respondent court. After declaring his belief that the "Von Wittenburg's situation" supported his belief that there was "a peculiar relationship" between the district attorney and the Weiss office, the judge said: "About this statement, 'He further emphasized...'—meaning Mr. VonWittenberg—'...that he was aware of another case,' I haven't the slightest idea from this transcript what that means. But I have read Mr. Sherman's statement, and the last page of his initial Declaration in Opposition—no—in Support of the Motion for Recusal, he mentions something very similar to this same thing, i.e.,—I have forgotten the general statement, and I could look it up—but words, the magic words for the record are Dr. Flack."

Neither the magic in the name of Dr. Flack nor the source of the trial court's "uncomfortable feeling" can be found in the record. The order recusing the entire office of the district attorney in these circumstances exceeded the bounds of the court's discretion.

Let a peremptory writ of mandate issue requiring the respondent court to vacate its order of April 14, 1980, recusing the district attorney.

Woods, J., and Hogoboom, J.,* concurred.

A petition for a rehearing was denied October 15, 1980, and the judgment was modified to read as printed above. The petitions of real parties in interest for a hearing by the Supreme Court were denied December 17, 1980. Bird, C. J., was of the opinion that the petitions should be granted.

---

*Assigned by the Chairperson of the Judicial Council.