[Crim. No. 15050. Fourth Dist., Div. One. May 14, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTONIO LOPEZ, Defendant and Appellant.

COUNSEL

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Keith I. Motley and Robert B. Shaw, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WIENER, J.—Antonio Lopez appeals from the judgment entered on jury verdicts convicting him on four counts of robbery (Pen. Code, § 211)[1] and a single count of second degree burglary. (§§ 459, 460, subd. 2.) We conclude substantial evidence supports the judgment and the court's denial of Lopez' pretrial motion to recuse the entire staff of the Imperial County District Attorney's (DA) office. We also conclude the court properly denied Lopez' motion for a new trial. Accordingly, we affirm.

I

*Factual Background*

Because Lopez challenges the sufficiency of the evidence, we state the facts in detail so we may thoroughly examine his argument.

---

[1]All statutory references are to the Penal Code unless otherwise specified.

On October 12, 1981, three men robbed five Mexican nationals working at the Fairline Feed Lot near Calapatria. The victims, Andres Santillan, Manuel Alvarez, Mario Santillan, Isidro Calixto and Elias Calixto, were in the United States illegally from central Mexico. They lived in a trailer and shed near their work.

The victims were acquainted with some Fairline employees, including Lopez. Lopez had a "cholo" manner about him. "Cholo," a lifestyle often affected by young men of Mexican ancestry living near the Mexican border, does not necessarily indicate criminal or gang behavior. "Cholo" vocabulary is marked by words not normally used by Mexicans from the interior of the country and by the liberal use of profanity, particularly the word "puto" meaning "queer" or "fag." The "cholo" walk, as described by Lopez' counsel, is "like a cowboy walking down the streets of Tombstone."

On the day of the robbery, the Fairline foreman told Lopez his temporary employment of two weeks was terminated. Later that day Lopez told Gary Tackett he had been fired because Fairline preferred to use the cheaper labor of illegal aliens. At trial Lopez denied bearing any animosity toward illegal aliens, although he was unhappy he was not told at the outset that his job was only temporary.

About 8 p.m. on October 12 Andres, Manuel and Elias were sleeping in the shed and Mario and Isidro were sleeping in the trailer. Manuel heard a noisy car and went outside to investigate. He saw an older car with three taillights on each side. A voice told him not to move. He slowly turned and saw three men whose faces were completely covered by ski masks. One man was armed with a baseball bat, the second with a shotgun and the third, who did all the talking, with a pistol. Manuel was ordered to lie on the ground. He heard gunshots. The man with the pistol then demanded his wallet.

Andres, overhearing the demand for Manuel's wallet, started to go outside. As he was doing so the robbers with the pistol and bat entered the shed. The man with the pistol ordered Andres and Elias outside and took their wallets.

The same robber then yelled at Isidro and Mario to come out of the trailer. When they did not respond he fired two shots, hitting Mario in the arm and shoulder and Isidro in the face. Once outside they gave the man their wallets. The total amount taken from the victims was about $600.

Andres, Mario, Isidro and Manuel each identified Lopez at trial as the robber with the pistol. Lopez had the same general height and weight as the

robber and had the same distinctive "cholo" walk. The robber's voice sounded the same as Lopez' and he used the same distinct "cholo" accent and vocabulary Lopez used, particularly the constant use of the word "puto." The victims admitted limited contact with Lopez or anyone else affecting the "cholo" lifestyle. They were unable to identify the other two robbers.

Manuel also admitted that while waiting for help he and the other victims discussed the possible identity of the robbers and reinforced each other's opinion that Lopez was the one with the pistol. They so informed the Calapatria police.

Lopez and Jose Cortez were arrested about 9:30 p.m. on October 12 while riding in Cortez' car, which had taillights like those described by Manuel. When arrested Lopez had about $213 in his possession. The pattern of Cortez' shoes matched some of the footprints found at the robbery scene, but no positive match could be made. Some of the tiretracks could have been made by Cortez' car.

Arthur Valdez testified Lopez purchased a $3.50 orange and brown ski cap from him on October 12. Lopez paid for the cap out of his $240 Fairline paycheck. The cap described by the victims was dark-colored. Lopez said he bought the cap from Valdez using his severance check but then gave the cap to his father. The $213 he had when arrested represented the difference between his severance check and the cost of the cap, minus an additional $15 he gave to his younger brother Oscar. He was unable to account for the approximate $10 discrepancy.

The prosecution impeached Lopez on the source of the money in his possession upon arrest. Tackett testified he went to Lopez' house on October 12 to ask about collecting a $120 debt from Lopez. Lopez said he was going to cash his severance check and would pay Tackett the next day. On October 13 Lopez' wife paid Tackett $120 cash. Tackett testified she said Lopez had given her the balance of his severance check after cashing it the day before. Lopez' wife later admitted she paid the debt, but insisted she used money Oscar had given her. She said her husband had not given her any money on the 12th.

Lopez had an alibi defense. Oscar testified Lopez spent the early evening hours with him at their Calapatria home. Oscar thought the earliest Lopez left the house that evening was 8 p.m. Jaime Ortega testified he and Lopez had been drinking beer outside Lopez' house. Ortega thought Lopez left about 8:30 p.m.

Lopez' father confirmed his son's testimony. Mr. Lopez arrived home about 6:30 p.m. on October 12. His son was there and gave him the ski cap about 10 minutes later. Lopez was still at home when Mr. Lopez returned to work about 7:45 p.m.

Lopez denied being involved in the robbery or affecting any of the mannerisms associated with the "cholo" lifestyle. Although he knew where the victims lived, he said he had had little contact with them.

*Pretrial—Recusal Motion*

Shortly before trial Lopez unsuccessfully moved to recuse the entire staff of the DA's office. (§ 1424.) Lopez based his motion on the appearance of impropriety resulting from the following chronology.

Larry Smith represented Lopez during the preliminary hearing held from November 24 through December 1, 1981. Smith represented Lopez until December 14, 1981, when new counsel appeared with Lopez for arraignment at the superior court. On February 16, 1982, about one week before Lopez' scheduled trial date, Smith joined the 10-person DA's office. Lopez filed his recusal motion the following day.

The only evidence submitted at the recusal hearing were the declarations of Smith and Deputy District Attorney Steven F. Wingfield. Smith declared he had not represented Lopez after December 13, 1981. The DA hired him as a deputy district attorney on February 16, 1982. Smith also declared he had not and would not discuss Lopez' strategy with anyone in the DA's office, nor had he or would he divulge any client confidences or cooperate in the prosecution of the case. Wingfield declared he was the prosecutor assigned to the case. He had not communicated with Smith about the case and neither had nor would seek any cooperation from Smith in prosecuting the case.

In addition, a deputy attorney general stated, without contradiction, that Smith occupied an entry level position in the DA's office and did not participate either in evaluating prosecutorial personnel or formulating prosecution policies. He also noted Smith's assignment was to handle the DA's calendar in municipal court. No information was provided regarding the proximity of Smith's and Wingfield's offices or the frequency of their contacts. However, under questioning by the court, Lopez' counsel stated he had "no information or even a belief" that Smith had divulged any privileged information about Lopez' case to Wingfield.

*Posttrial—New Trial Motion*

Lopez moved for a new trial on the ground of newly discovered evidence (§ 1181, subd. 8) and the denial of a fair trial due to the prosecution's alleged suppression of that evidence contrary to a discovery order. (See *People* v. *Davis* (1973) 31 Cal.App.3d 106, 109-110 [106 Cal.Rptr. 897].) The proffered evidence consisted of two anonymous letters written in Spanish which stated Lopez had not committed the robbery. The court reviewed the letters, considered the following facts and denied the motion.

The first letter dated February 19, 1982, was received during trial by the investigating officer, a deputy sheriff. The second letter dated March 31, 1982, was directed to the court after the guilty verdicts were returned. Both letters purported to be from the missing fifth victim who had not testified at trial. Neither letter was provided to the defense until after trial. The record does not disclose when and how the prosecution became aware of the letters' existence.

Each letter indicated the writer was present when the robbery occurred and emphatically stated Lopez was not involved. The robbers were short and fat; Lopez is thin. The four victims who testified were liars. They blamed Lopez to help some unnamed people get even with him because of his testimony in another case. The writer sent the letters to clear his troubled conscience.

Lopez' counsel and an investigator from the DA's office investigated the source of the letters. They travelled to a small town in central Mexico where they spoke with Elias Calixto, the only victim absent from the trial. Elias said he had never written any letters about the case. After examining the two anonymous letters, Elias specifically denied writing them. Lopez' counsel obtained a handwriting exemplar from Elias. The exemplar had not been professionally analyzed by the time of the new trial hearing. However, Lopez' counsel candidly conceded the exemplar "looks to be dissimilar to the letters that the court received and that the sheriff's office received."

## II

*Substantial Evidence Supports the Judgment*

Where sufficiency of the evidence is an issue, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v.

*Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

Admittedly this is a close case made particularly difficult by the problems associated with eyewitness identification. (See *People* v. *Bustamante* (1981) 30 Cal.3d 88, 98-99 [177 Cal.Rptr. 576, 634 P.2d 927]; *People* v. *Hurley* (1979) 95 Cal.App.3d 895, 903-904 [157 Cal.Rptr. 364], conc. and dis. opn., Hopper, J.) Moreover, not only did the events occur within a brief time, 10 minutes, but in light of the illegal status of the victims their objectivity probably was not enhanced by being confronted and interrogated by investigators from the sheriff's office. ▆ ▆ ▆ ▆ Nonetheless, we hold there is sufficient evidence to support the judgment.[2]

▆ Four victims identified Lopez as one of the three assailants because of his voice, build, walk, pronunciation and terminology. Additional circumstantial evidence corroborated the victims' testimony. Lopez was arrested about an hour and a half after the robbery in a vehicle with taillights similar to those on the vehicle used by the robbers. Matching tiretracks and footprints linked that vehicle and its driver to the robbery scene. Lopez had an amount of money in his possession equal to about one-third of the robbery proceeds. His exculpatory testimony on the source of those funds did not square with Tackett's testimony. Lopez also had a motive based on his perception the victims had taken his job. On this evidence a reasonable jury, having the opportunity to observe the demeanor and credibility of the respective witnesses, could have found Lopez guilty beyond a reasonable doubt.

*Substantial Evidence Supports the Court's Denial of the Recusal Motion*

▆ Upon a proper showing, a trial court has the power to recuse the entire staff of a district attorney's office prosecuting a criminal case. (*People* v. *Superior Court (Greer)* (1977) 19 Cal.3d 255, 261-265 [137 Cal.Rptr. 476, 561 P.2d 1164]; *Younger* v. *Superior Court* (1978) 77 Cal.App.3d 892, 895-897 [144 Cal.Rptr. 34].) However, "[i]t is important to note that *Greer* merely states that the trial court *may,* within its discretion, excuse the district attorney, not that it must." (*People* v. *Battin* (1978) 77 Cal.App.3d 635, 671 [143 Cal.Rptr. 731, 95 A.L.R.3d 248], cert. den., 439 U.S. 862 [58 L.Ed.2d 171, 99 S.Ct. 183], original italics.) Moreover, the court should exercise particular caution in cases such as this where the

---

[2]We would be less than candid if we did not acknowledge some additional misgivings caused by the two anonymous letters which, although written in an awkward manner, convey a simple but eloquent plea for justice. Those letters, however, were not part of the evidentiary record at trial and thus may not be considered in determining the sufficiency of the evidence to support the judgment.

issue is whether an entire prosecutorial office rather than a single prosecutor should be recused. (*Love* v. *Superior Court* (1980) 111 Cal.App.3d 367, 371 [168 Cal.Rptr. 577]; *Chadwick* v. *Superior Court* (1980) 106 Cal.App.3d 108, 115 [164 Cal.Rptr. 864].) Caution is necessary because "when the entire prosecutorial office of the district attorney is recused and the Attorney General is required to undertake the prosecution or employ a special prosecutor, the district attorney is prevented from carrying out the statutory duties of his elected office and, perhaps even more significantly, the residents of the county are deprived of the services of their elected representative in the prosecution of crime in the county. The Attorney General is, of course, an elected state official, but unlike the district attorney, is not accountable at the ballot box exclusively to the electorate of the county. Manifestly, therefore, the entire prosecutorial office of the district attorney should not be recused in the absence of some substantial reason related to the proper administration of criminal justice." (*People* ex rel. *Younger* v. *Superior Court* (1978) 86 Cal.App.3d 180, 204 [150 Cal.Rptr. 156].)

Whether a recusal motion should be granted is governed by section 1424 which provides in part: "The motion shall not be granted unless it is shown by the evidence that a conflict of interest exists such as would render it unlikely that the defendant would receive a fair trial." ■ Our responsibility is to review the trial court's decision on the motion "only to determine whether there was substantial evidence presented to support its holding. 'Substantial evidence' means that evidence which, when viewed in light of the entire record, is of solid probative value, maintains its credibility and inspires confidence that the ultimate fact it addresses has been justly determined. [Citations.]" (*People* v. *Conner* (1983) 34 Cal.3d 141, 149 [193 Cal.Rptr. 148, 666 P.2d 5]; see also *Trujillo* v. *Superior Court* (1983) 148 Cal.App.3d 368, 373 [196 Cal.Rptr. 4].)

■ Presumably the Legislature had a reason for selecting the words "unlikely" and "fair," rather than the usual "miscarriage of justice" standard of article VI, section 13 of the California Constitution. Had the latter standard been adopted, a trial court would recuse the district attorney only when it believes it is reasonably probable the defendant will obtain a more favorable result if the district attorney is disqualified. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The legislative decision to adopt a different standard based on the likelihood of a fair trial suggests a more expansive view concerned not only with the prospective result but also with the fairness of a defendant's trial. This broad concern reflects the constitutional principle that "[a] fair and impartial trial is a fundamental aspect of the right of accused persons not to be deprived of liberty without due process of law. [Citations.]" (*People* v. *Superior Court (Greer)*, *supra*, 19 Cal.3d at p. 266.) Against this backdrop, a court's prospective deter-

mination of what may be an unfair trial in our criminal justice system requires inquiry, among other things, into whether an appearance of impropriety exists and, if so, its likely effect, if any, on the fairness of the proceedings.

The appearance of impropriety is not a factor of constitutional dimensions in criminal cases involving prosecutorial disqualification. (*People* v. *Municipal Court (Byars)* (1978) 77 Cal.App.3d 294, 299-300 [143 Cal.Rptr. 491]; see *People* v. *Superior Court (Greer)*, *supra*, 19 Cal.3d at pp. 268-269; see also *People* v. *Rhodes* (1974) 12 Cal.3d 180, 186-187 [115 Cal.Rptr. 235, 524 P.2d 363].) Traditionally, however, concerns for appearances have played an important part in such cases. (See, e.g., *Love* v. *Superior Court, supra,* 111 Cal.App.3d at pp. 372-374; *People ex rel. Younger* v. *Superior Court, supra,* 86 Cal.App.3d at pp. 186, 192; *Younger* v. *Superior Court, supra,* 77 Cal.App.3d at pp. 895-897; see also *William H. Raley Co.* v. *Superior Court* (1983) 149 Cal.App.3d 1042, 1047, fn. 2 [197 Cal.Rptr. 232].) In *Greer* our Supreme Court said: " 'It is essential that the public have absolute confidence in the integrity and impartiality of our system of criminal justice. This requires that public officials not only in fact properly discharge their responsibilities *but also that such officials avoid, as much as is possible, the appearance of impropriety.'* . . . Similar considerations led the American Bar Association to adopt, in its Standards Relating to the Prosecution Function, a provision that 'A prosecutor should *avoid the appearance or reality of a conflict of interest with respect to his official duties.'* . . . [¶] . . . [Thus] we conclude that a trial judge may exercise his power to disqualify a district attorney from participating in the prosecution of a criminal charge when the judge determines that the attorney suffers from a conflict of interest which might prejudice him against the accused and thereby affect, *or appear to affect,* his ability to impartially perform the discretionary functions of his office." (*People* v. *Superior Court (Greer)*, *supra,* 19 Cal.3d at pp. 268-269, italics added, fn. omitted; see also *People* v. *Rhodes, supra,* 12 Cal.3d at pp. 185-186.)

The appearance of impropriety, however, is a malleable factor having the chameleon-like quality of reflecting the subjective views of the percipient. (See *Deukmejian* v. *Superior Court* (1980) 110 Cal.App.3d 427, 433-437 [168 Cal.Rptr. 27]; *Younger* v. *Superior Court, supra,* 77 Cal.App.3d at p. 897.) Judicial decisionmaking should not turn on the psychological or philosophical perceptions of those involved. Matters as significant to the public and the parties as removing the entire staff of a district attorney's office in a criminal case require reliance upon more objective criteria. Concern with the ephemeral quality of the appearance of impropriety in civil cases involving vicarious disqualification of entire law firms has led to the elimination of such appearance as a factor because that ground " 'is simply

too vaporous to support a disqualification order. . . .'" (*Chambers v. Superior Court* (1981) 121 Cal.App.3d 893, 902 [175 Cal.Rptr. 575]; see also *William H. Raley Co.* v. *Superior Court, supra,* 149 Cal.App.3d at pp. 1048-1049.).

Section 1424 was the Legislature's response to *Greer* and other criminal cases stressing the importance of the appearance of impropriety and other "apparent" conflicts as bases for prosecutorial disqualification. The analysis of Senate Bill No. 1520 (later enacted as ch. 780 of the Statutes of 1980) by the Assembly Committee on Criminal Justice states the enactment of section 1424 was in response to the apparent substantial increase in the number of unnecessary prosecutorial recusals after *Greer.* (Bill Analysis (June 23, 1980) p. 2.) The legislation was introduced to reverse that increase by giving notice and standing to the Attorney General and by eliminating the "appearance" standard of *Greer.* (*Ibid.*) Under the statute as proposed, an *actual* conflict of interest had to be established by a preponderance of the evidence before recusal could be ordered. (*Id.,* at pp. 1, 3.) However, in light of the statutory language as enacted, it is questionable whether the Legislature truly intended to eliminate "appearance" as a disqualification factor. Had the Legislature intended to do so, presumably it would have said so. Because the statutory language is ambiguous, the "appearance" factor may still be a relevant consideration. In addressing this issue, the California Supreme Court in *People* v. *Conner, supra,* 34 Cal.3d 141, explained: "This standard [of § 1424] differs from that enunciated by us in *Greer.* While section 1424 does not specify whether the disqualifying conflict must be 'actual' or need only generate the 'appearance of conflict,' in either event, the conflict must be of such gravity as to render it unlikely that defendant will receive a fair trial unless recusal is ordered. [¶] Several factors in combination persuade us that the section contemplates both 'actual' and 'apparent' conflict when the presence of either renders it unlikely that defendant will receive a fair trial. Traditionally, conflicts raised in varied contexts have involved both actuality and appearance. [Citations.] Further, the legislative history of section 1424 reflects concern about the effects of the elimination of the 'appearance of conflict' standard. While it is conceivable that an 'appearance' of conflict could signal the existence of an 'actual' conflict which, although prejudicial to the defendant, might be extremely difficult to prove, we think that the additional statutory requirement (that a conflict exist such as would render it unlikely that the defendant would receive a fair trial) renders the distinction between 'actual' and 'appearance' of conflict less crucial. [¶] In our view a 'conflict,' within the meaning of section 1424, exists whenever the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner. Thus, there is no need to

determine whether a conflict is 'actual,' or only gives an 'appearance' of conflict." (*Id.,* at pp. 147-148.)

The facts of *Conner* supported the trial court's order recusing the entire district attorney's office. Recusal was ordered because a deputy district attorney, Braughton, was a witness to, and arguably a victim of, the criminal conduct giving rise to Conner's prosecution. Braughton's "harrowing experience and understandable emotional involvement in this case were communicated to his fellow workers via his own conversations with a substantial number of the DA's personnel and also through the media coverage and interviews concerning the incident. Because of the dramatic and gripping nature of the circumstances, the pervasiveness of the communications regarding Braughton's relationship to the incident, and the difficulty in gauging their cumulative effect, we conclude that substantial evidence supported the trial court's determination that there was a conflict of interest in this case." (*People* v. *Conner, supra,* 34 Cal.3d at p. 148.) In concluding the conflict warranted recusal under section 1424, the court explained: "Braughton is inextricably involved in this case. He disclosed that involvement to a substantial number of his fellow workers. Because the felony division of the DA's office is composed of about 25 attorneys, we have no difficulty in assuming that there is a commendable camaraderie which exists among these officials. It is reasonable to conclude that an apparent threat to one deputy coupled with his witnessing the serious injury actually inflicted on the deputy sheriff during the same course of events may well prejudice the coworkers of Braughton and the deputy sheriff. While it may be difficult, if not impossible, to prove that a bias of the DA's office will *definitely* affect the fairness of a trial, the trial court is in a better position than are we to assess the likely effect of the shooting incident. We will not disturb the court's conclusion that the DA's discretionary powers exercised either before or after trial (e.g., plea bargaining or sentencing recommendations), consciously or unconsciously, could be adversely affected to a degree rendering it unlikely that defendant would receive a fair trial." (*Id.,* at pp. 148-149, italics in original; compare *Chadwick* v. *Superior Court, supra,* 106 Cal.App.3d at p. 121, and cases there cited.)

Here, Smith's change of employment resulted in a different type of conflict of interest than the conflict in *Conner.* The present conflict arose because of the risk of disclosure of confidential information which Smith obtained during his previous attorney-client relationship with Lopez. (See *Love* v. *Superior Court, supra,* 111 Cal.App.3d at pp. 370-371; *People* v. *Johnson* (1980) 105 Cal.App.3d 884, 889-890 [164 Cal.Rptr. 746].) This difference does not eliminate the problem. It only means other factors must be considered in determining whether the conflict warrants recusal under section 1424.

■ It is axiomatic that it is improper for a district attorney "to prosecute a client or former client, without that client's consent, for a crime 'relating to a matter in reference to which [the attorney] has obtained confidential information by reason of or in the course of his employment by such client or former client.' [Citations.]" (*People v. Superior Court (Greer), supra,* 19 Cal.3d at p. 261.) "An attorney is forbidden to use against a former client any confidential information that was acquired during that client relationship. (. . .; Bus. & Prof. Code, § 6068, subd. (e) (preserving client's secrets); Rules Prof. Conduct, rule 4-101 (employment adverse to former client), rule 5-102(B) (representation of conflicting interests).) Moreover, the attorney has a duty to withdraw, or apply to a court for permission to withdraw, from representation that violates those obligations. (Rules Prof. Conduct, rule 2-111(B)(2).)" (*Leversen v. Superior Court* (1983) 34 Cal.3d 530, 538 [194 Cal.Rptr. 448, 668 P.2d 755].) These principles governing an attorney's professional responsibilities are fundamental to our concepts of law and criminal justice and are repeated in the same or similar language in cases from other jurisdictions. " '[N]othing is better settled than that an attorney who acquires knowledge of the affairs of another pending the relationship of attorney and client between them cannot use such knowledge afterwards to the detriment of his former client. An attorney who has been on one side of litigation will not be allowed to take a position in subsequent cases where the knowledge derived from his former client might be used to the prejudice of such client. [Citations.]' " (*Burkett v. State* (1974) 131 Ga.App. 662 [206 S.E.2d 848, 850]; see also cases cited in *People v. Superior Court (Greer), supra,* 19 Cal.3d at p. 261.)

In light of the above authority, the People properly conceded at the recusal hearing that Smith should not participate or assist in any way in the prosecution of Lopez' case. The difficult question for the trial court was whether Smith's conflict of interest required it to apply the general rule that "[i]f a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment." (ABA Code of Prof. Responsibility, DR 5-105(D); see *Chambers v. Superior Court, supra,* 121 Cal.App.3d at p. 898, fn. 3.) ■ In a section 1424 context, the decision whether to apply this vicarious disqualification rule turns on whether application of the rule is necessary to ensure the likelihood of a fair trial for the defendant. (Compare *William H. Raley Co. v. Superior Court, supra,* 149 Cal.App.3d at pp. 1048-1049 (criteria for application of vicarious disqualification rule in civil cases).)

In the factual context of this case, application of Disciplinary Rule 5-105(D) would serve two purposes: protection of Lopez' confidential information (see *Love v. Superior Court, supra,* 111 Cal.App.3d at pp. 372-374;

*People* v. *Johnson, supra,* 105 Cal.App.3d at pp. 890-891) and elimination of any appearance of impropriety resulting from Smith's change of employment. (See *Love* v. *Superior Court, supra,* 111 Cal.App.3d at pp. 372-374; *Younger* v. *Superior Court, supra,* 77 Cal.App.3d at pp. 895-897.) Thus the specific section 1424 issue in this case was whether the accomplishment of either of these purposes through application of the vicarious disqualification rule was necessary to ensure the likelihood of a fair trial for Lopez.

The trial court reasonably concluded that vicarious disqualification of the DA's office was not necessary to protect any confidential information. Smith's and Wingfield's declarations were uncontroverted. Notwithstanding the probable intimacy of the 10-person DA's office, there was no suggestion or evidence that any leak in the wall of silence between Smith and his colleagues had occurred or would occur. Moreover, the court itself expressed its complete confidence in Smith's integrity.[3] That assessment, made from a vantage point close to the circumstances and people involved, is entitled to our deference. (See *People* v. *Conner, supra,* 34 Cal.3d at p. 149.) Further, the court had no reason to doubt the applicable presumptions that Smith had not and would not violate his professional obligation to protect Lopez' confidences (*Chadwick* v. *Superior Court, supra,* 106 Cal.App.3d at p. 116) and that Smith would advise the court if any circumstances developed which threatened betrayal of those confidences. (See *Leversen* v. *Superior Court, supra,* 34 Cal.3d at p. 537.) The court also concluded there were no other facts related to Smith's position or duties in the DA's office which suggested or indicated any possibility that Smith's presence in that office might improperly affect the prosecution of Lopez' case. (See *Chadwick* v. *Superior Court, supra,* 106 Cal.App.3d at pp. 116-119, 121, 123; compare *Younger* v. *Superior Court, supra,* 77 Cal.App.3d at p. 897.)

The resolution of Lopez' motion, therefore, turned solely on the necessity to a fair trial of recusing the entire DA's office so as to eliminate any appearance of impropriety resulting from Smith's change of employment.[4]

[3] "The declarations indicate that Mr. Smith has pledged not to interfere—to interfere in any way to the case, and Mr. Wingfield has pledged not to take any unfair advantage or attempt to take any information from Mr. Smith, and certainly, what I know of Mr. Smith, he has been nothing but extremely vigorous in protecting the defendants and their rights, while he was doing his time as a defense attorney. I certainly know of no reason why I would expect that Mr. Smith wouldn't do exactly what he is pledging himself to do."

[4] "THE COURT: Mr. Cota, would it be fair to say that the issues, as framed by your pleadings, is nothing more than Mr. Smith, former attorney of Lopez, is now in the district attorney's office, and he [Lopez] is pending trial, and that the D.A. ought to be recused; is basically the issue that you present to this court?

"MR. COTA: That is right. . . . [I]f the court is asking whether I have any other information, and would like—for example, Mr. Williams divulging privilege information, absolutely not. I have no—excuse me, Mr. Smith. I have no information or even a belief that that is happening. It is merely the situation where he [Smith] has gone from defense attorney to the district attorney's office, period."

Governed by the "appearance" standard of presection 1424 precedent, the DA's office should have been recused. (See, e.g., *Love* v. *Superior Court, supra,* 111 Cal.App.3d at pp. 372-374.) ■ Now, however, the judicial inquiry under section 1424 must be on whether the appearance of impropriety resulting from the conflict of interest such as that involved here "evidence[s] a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner." (*Conner* v. *Superior Court, supra,* 34 Cal.3d at p. 148.)

■ Other than the "appearance" factor, there was nothing before the lower court at the time of the recusal hearing hinting the prosecution of this case would be anything other than "evenhanded" and fair. Based on the evidence and its familiarity with the circumstances and people involved, the court reasonably concluded any appearance of impropriety resulting from Smith's change of employment did not warrant recusal of the entire DA's office. (See *Love* v. *Superior Court, supra,* 111 Cal.App.3d at p. 375, fn. 1.) We will not disturb the court's conclusion. (See *People* v. *Conner, supra,* 34 Cal.3d at p. 149.)

*The Court Properly Denied the New Trial Motion*

■ "In passing upon a motion for a new trial, the trial court has very broad discretion, and this court would be reluctant to interfere with a decision granting or denying the motion unless there is a clear showing of an abuse of that discretion. [Citation.]" (*People* v. *Jones* (1981) 123 Cal.App.3d 83, 89 [176 Cal.Rptr. 398].)

Lopez says there were many ways his adroit use of the February 19, 1982, letter might have affected the outcome of his trial. For example, handwriting samples could have been obtained from all five victims to see which one, if any, wrote the letter. He also argues it is possible if each victim had been confronted with the letter at trial, one of them might have admitted writing the letter or causing it to have been written. Further, he argues the letter would have provided a valuable source of material for cross-examination of the victims.

Out of an abundance of caution the court granted Lopez' counsel time to investigate the source of the two letters. Counsel's investigation and ultimate conversation with Elias Calixto, the apparent source, yielded negative results. The possibility Elias or one of the other victims would have responded favorably to Lopez had they been confronted with the letters at trial is speculative at best. We presume Lopez' counsel presented all the newly discovered information to the court at the new trial hearing. Nothing additional has been presented in this appeal to persuade us the court incorrectly

concluded the letters did not render a different result probable on retrial. (*People* v. *Randle* (1982) 130 Cal.App.3d 286, 292 [181 Cal.Rptr. 745].) Moreover, lacking the necessary foundation (Evid. Code, §§ 403, subd. (a)(3), 1401, subd. (a)), the letters would have been inadmissible at a new trial. Had the court granted Lopez' motion, in effect it would have succumbed to a clever ghost writer who articulated the specter of an innocent man languishing in prison. Since that specter haunts the judicial conscience in every criminal case, its embodiment in the form of two anonymous letters added nothing to the motion for new trial. We therefore decide the court acted within its discretion in denying the motion.

*Disposition*

Judgment affirmed.

Cologne, Acting P. J., and Butler, J., concurred.