[No. S049490. Dec. 23, 1996.]

THE PEOPLE, Plaintiff and Appellant, v.
GORDON EUBANKS et al., Defendants and Respondents.

582

**COUNSEL**

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Michael D. O'Reilley, Martin S. Kaye and Eugene W. Kaster, Deputy Attorneys General, for Plaintiff and Appellant.

Gil Garcetti, District Attorney (Los Angeles), George M. Palmer and Shirley S. N. Sun, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Appellant.

Charles C. Marson, Morgan, Ruby, Schofield, Franich & Fredkin, Ruby & Schofield, Allen Ruby, Remcho, Johansen & Purcell, Robin B. Johansen, Joseph Remcho, Nolan & Armstrong and Thomas J. Nolan for Defendants and Respondents.

Peter A. Chang, Jr., and Vicki I. Podberesky as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**WERDEGAR, J.**—When the victim of an alleged crime contributes financially to the costs of the district attorney's investigation, does the district

attorney thereafter suffer from a disabling conflict of interest requiring recusal under Penal Code section 1424? On this question of first impression, we hold such financial assistance to the prosecutor's office may indeed disqualify the district attorney from acting further in a case, if the assistance is of such character and magnitude "as to render it unlikely that defendant will receive fair treatment during all portions of the criminal proceedings." (*People* v. *Conner* (1983) 34 Cal.3d 141, 148 [193 Cal.Rptr. 148, 666 P.2d 5].) In this case, where a corporation alleged to be the victim of trade secrets theft contributed around $13,000 to the cost of the district attorney's investigation, the superior court did not abuse its discretion in finding the victim's financial assistance created a conflict of interest for the prosecutor. The trial court did err in failing to apply the further test set out in Penal Code section 1424: whether the resulting conflict was so severe as to make fair treatment of the defendants *unlikely*. We conclude, however, that such a finding would not, on this record, be an abuse of discretion.

### Factual and Procedural Background

Defendants Gordon Eubanks and Eugene Wang were accused, by grand jury indictment, of conspiracy to steal trade secrets (Pen. Code, §§ 182, 499c),[1] conspiracy to receive stolen property (§§ 182, 496), and conspiracy to access and make use of computer data without permission (§§ 182, 502, subd. (c)(2)). In addition to these joint conspiracy counts, Wang was charged with several counts of trade secret theft (§ 499c) and unlawful data use (§ 502, subd. (c)(2)), while Eubanks was charged with several counts of receiving stolen property (§ 496).

Both defendants moved to disqualify the Santa Cruz County District Attorney for a conflict of interest pursuant to section 1424. After an evidentiary hearing, the superior court granted the recusal motion. As permitted under section 1424, the Attorney General and the Santa Cruz County District Attorney, both of whom had appeared in the superior court to oppose recusal, appealed the ruling. The Court of Appeal reversed. We granted review on defendants' petition.[2]

In September 1992, defendant Eugene Wang was a vice-president of Borland International, a software developer located in Scotts Valley (Santa

---

[1]Unless otherwise specified, all further statutory references are to the Penal Code.

[2]After oral argument was held in this matter, the charges against Eubanks and Wang were dismissed on request of the Santa Cruz County District Attorney. Although the matter is thus rendered moot, we exercise our discretion to resolve the legal issues raised, which are of continuing public interest and are likely to recur. (*Baluyut* v. *Superior Court* (1996) 12 Cal.4th 826, 829, fn. 4 [50 Cal.Rptr.2d 101, 911 P.2d 1]; *Liberty Mut. Ins. Co.* v. *Fales* (1973) 8 Cal.3d 712, 715-716 [106 Cal.Rptr. 21, 505 P.2d 213].)

Cruz County). Defendant Gordon Eubanks was president and chief executive officer of Symantec Corporation, a competitor of Borland. In July of 1992, Wang had expressed dissatisfaction with a Borland management reorganization and threatened to resign. On September 1, 1992, he submitted his resignation. Fearing Wang might have conveyed internal Borland information to outsiders, Borland officers reviewed Wang's electronic mail files. They found several messages to Eubanks containing what they believed was confidential Borland information. Borland contacted the Scotts Valley police, who in turn sought investigative assistance from the district attorney's office.

During the night of September 1, and into the morning of September 2, 1992, Borland officials worked with representatives of the police department and district attorney's office preparing warrant affidavits for searches of defendants' residences and Symantec headquarters. Apparently because the police department and prosecutor's office lacked staff with the expertise to search the Symantec computers, Alan Johnson, the district attorney's chief inspector, asked Borland officials if Borland could provide one or more technically competent employees to assist in the search. The Borland representatives declined because they did not want Borland employees exposed to Symantec secrets; they suggested independent consultants be used instead.

Two computer specialists were located to assist with the September 2 search: David Klausner, who was referred by Borland's outside counsel, and Stephen Strawn, who had worked with the district attorney's office on prior occasions. Chief Inspector Johnson and John Hansen, associate general counsel for Borland, both testified that on the night of September 1 and 2, at the request of the district attorney's office, Borland agreed to pay for Klausner's services.

According to Johnson, Spencer Leyton, a senior Borland executive, indicated Borland's willingness to spend up to $10,000, and possibly more, for experts to assist in the investigation. Leyton, however, did not recall discussing the matter of expert assistance at all, although he was present and talked with Johnson on the night and morning of September 1 and 2. Borland records show a $25,000 "blanket" purchase order was drawn up and approved by the legal department in November 1992 for "miscellaneous services and fees / Symantec lawsuit." Borland records for the subsequent payments to Klausner, Strawn and others for their work on the criminal investigation bear numerical references to this purchase order.

Klausner and Strawn accompanied representatives of law enforcement agencies who executed the warrant on September 2. Klausner submitted his

bill for $1,400 directly to Borland on September 14, 1992. Borland paid it by a check dated January 6, 1993.

Strawn continued to work on the criminal investigation for several weeks, into October 1992, assisting the district attorney's office in retrieving and printing the contents of seized computer disc drives. In late September 1992, knowing Strawn was working on the case, Chief Inspector Johnson discussed with Arthur Danner, the Santa Cruz County District Attorney, whether Borland should be asked to pay Strawn's anticipated bill. Danner made no decision at that time. Johnson testified he then asked Borland executive Leyton whether Borland was "still willing to assist us by carrying the cost of the technicians that were necessary to process this case." Leyton, according to Johnson, answered affirmatively. Sometime after that discussion, Johnson again broached the question with Danner, who then approved submitting Strawn's invoices to Borland.

District Attorney Danner similarly testified he first considered the payment question while Strawn was still working with the office's investigators. Asked whether, at that time, he contemplated abandoning the prosecution if Borland did not pay for Strawn's services, Danner testified: "No. . . . It was simply at that point to have the investigation proceed because at that point we needed the additional materials and so that's what Mr. Straun [sic] was working on to allow us to review those materials."

Danner articulated two reasons for his ultimate decision to allow Borland to pay for Strawn's assistance: First, he understood Strawn's role to be purely technical, and not to involve giving any opinion as to whether the materials retrieved were trade secrets. Danner considered Strawn's limited role important because it meant Borland's payment of his fee was less likely to become a significant issue at trial. Danner's second reason for approving the payment was that "at that time we were experiencing serious budgetary constraints in a particular fund that we utilize to pay professional and special witnesses and we really had very little money in our budget . . . ."

Strawn submitted his bill for $9,450 to the district attorney's office on October 31, 1992. After getting approval from Danner, Chief Inspector Johnson transmitted it to Borland. Borland attorney John Hansen testified he received the invoice and "sent it along for payment." His understanding was that Strawn's services had been necessary because "somebody had to go on the search along with the authorities," and hiring Strawn thus "relieved us from having to send a Borland employee into a competitor's plant." After Borland's general counsel, relying on Hansen's recommendation, approved the payment, Borland paid Strawn's bill by a check dated January 12, 1993.

In January 1993, Strawn submitted an additional invoice for $2,700 to the district attorney's office for work done in November and December 1992. Johnson forwarded this bill to Borland as well, but as of the date of the evidentiary hearing it had not been paid.

Finally, Borland paid a private service to transcribe audiotapes of interviews with Borland employees, for use by the prosecutor. John Hansen testified a district attorney's investigator told him, sometime in late 1992, that the investigation was "indefinitely" delayed because a clerical backlog in the district attorney's office was preventing the office staff from transcribing the tapes. Hansen offered to have Borland pay someone to make the transcriptions. In January and February 1993, Borland made payments of $1,008 and $1,224 to a reporting service for transcription of the tapes.

Defendants initially moved to recuse the entire office of the district attorney on the ground that Deputy District Attorney Jonathan Rivers, who had worked on the Eubanks-Wang case, had left the district attorney's office and been retained by Borland to work on Borland's related civil action against Symantec. In the course of a hearing on this issue, defendants learned of the payments by Borland, which were then made a separate ground for requesting recusal.

After hearing the above evidence, the superior court concluded that while Rivers's change of employment did not require recusal of the district attorney's office, the payments did. The court's rationale appears from its comments during argument on the motion (no written statement of reasons was filed). Discounting mere "appearances . . . of impropriety," the court framed the issue as whether the victim's "payment of money for a debt already incurred" by the district attorney creates "an actual conflict" for the prosecutor. The standard to be applied, as the court understood it, was whether "the evidence provides a reasonable possibility that the D.A.'s office may not exercise its discretionary function in an even-handed manner."

The court emphasized Borland's payment of Strawn's bill: "[W]e have a situation here where there was a debt . . . that's already been incurred. That person was going to get paid regardless of who paid it. Borland happens to make the offer and in fact does pay it, and pays other bills as well. Doesn't that put the District Attorney in a position, as a human being, to feel a greater obligation for this particular victim than some other fellow or person who doesn't offer to pay existing debts?" Answering its own rhetorical question, the court found the payment of the district attorney's incurred debt "rather strong evidence of a reasonable possibility that the discretionary

function that's fundamental to a District Attorney is compromised and thereby would not necessarily be used in an even-handed manner."

The Court of Appeal reversed the recusal order. First, the appellate court disagreed with the trial court's conclusion Borland's payments created a conflict of interest. The Court of Appeal viewed the payments as "comparable to the cooperation victims often give to prosecutors in criminal cases." Any sense of obligation arising from the payments, the court believed, was necessarily "minimal," and hence insufficient to show the existence of a conflict.

Alternatively, assuming the existence of a conflict, the Court of Appeal found its gravity insufficient to justify recusal. The trial court, the Court of Appeal noted, found only a "reasonable possibility" of unfair treatment, without determining whether, as required under section 1424, the conflict rendered it "unlikely" that defendant would receive fair treatment from the prosecutor. Moreover, to find fair treatment "unlikely" on these facts, the Court of Appeal held, would have exceeded the trial court's discretion.

## DISCUSSION

The question raised by this case is whether a crime victim's payment of substantial investigative expenses already incurred by the public prosecutor creates a disabling conflict of interest for the prosecutor, requiring his or her disqualification. Our examination of the question begins with exposition of the general principle that a public prosecutor must be free of special interests that might compete with the obligation to seek justice in an impartial manner (pt. I, *post*). In part II we focus on the statutory standard for recusal under California law, examining the origins and interpretation of section 1424. Finally, in part III, we apply the statutory standard to the case at bar, consistent with the more general principles explored earlier.

### I. *The Independence and Impartiality of the District Attorney*

■ In California, all criminal prosecutions are conducted in the name of the People of the State of California and by their authority. (Gov. Code, § 100, subd. (b).) California law does not authorize private prosecutions. Instead, "[t]he prosecution of criminal offenses on behalf of the People is the sole responsibility of the public prosecutor . . . . [¶] [who] ordinarily has sole discretion to determine whom to charge, what charges to file and pursue, and what punishment to seek. [Citation.] No private citizen, however personally aggrieved, may institute criminal proceedings independently [citation], and the prosecutor's own discretion is not subject to judicial control

at the behest of persons other than the accused." (*Dix* v. *Superior Court* (1991) 53 Cal.3d 442, 451 [279 Cal.Rptr. 834, 807 P.2d 1063].)

The district attorney of each county is the public prosecutor, vested with the power to conduct on behalf of the People all prosecutions for public offenses within the county. (Gov. Code, § 26500; *Hicks* v. *Board of Supervisors* (1977) 69 Cal.App.3d 228, 240 [138 Cal.Rptr. 101].) Subject to supervision by the Attorney General (Cal. Const., art. V, § 13; Gov. Code, § 12550), therefore, the district attorney of each county independently exercises all the executive branch's discretionary powers in the initiation and conduct of criminal proceedings. (*People* ex rel. *Younger* v. *Superior Court* (1978) 86 Cal.App.3d 180, 203 [150 Cal.Rptr. 156]; *People* v. *Municipal Court (Pellegrino)* (1972) 27 Cal.App.3d 193, 199-204 [103 Cal.Rptr. 645, 66 A.L.R.3d 717].) The district attorney's discretionary functions extend from the investigation and gathering of evidence relating to criminal offenses (*Hicks* v. *Board of Supervisors, supra,* 69 Cal.App.3d at p. 241), through the crucial decisions of whom to charge and what charges to bring, to the numerous choices the prosecutor makes at trial regarding "whether to seek, oppose, accept, or challenge judicial actions and rulings." (*Dix* v. *Superior Court, supra,* 53 Cal.3d at p. 452; see also *People* v. *Superior Court (Greer)* (1977) 19 Cal.3d 255, 267 [137 Cal.Rptr. 476, 561 P.2d 1164] [giving as examples the manner of conducting voir dire examination, the granting of immunity, the use of particular witnesses, the choice of arguments, and the negotiation of plea bargains].)

The importance, to the public as well as to individuals suspected or accused of crimes, that these discretionary functions be exercised "with the highest degree of integrity and impartiality, and with the appearance thereof" (*People* v. *Superior Court (Greer), supra,* 19 Cal.3d at p. 267) cannot easily be overstated. The public prosecutor " 'is the representative not of any ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.' " (*Id.* at p. 266, quoting *Berger* v. *United States* (1935) 295 U.S. 78, 88 [79 L.Ed. 1314, 1321, 55 S.Ct. 629].)

The nature of the impartiality required of the public prosecutor follows from the prosecutor's role as representative of the People as a body, rather than as individuals. "The prosecutor speaks not solely for the victim, or the police, or those who support them, but for all the People. That body of 'The People' includes the defendant and his family and those who care about him.

It also includes the vast majority of citizens who know nothing about a particular case, but who give over to the prosecutor the authority to seek a just result in their name." (Corrigan, *On Prosecutorial Ethics* (1986) 13 Hastings Const.L.Q. 537, 538-539.) Thus the district attorney is expected to exercise his or her discretionary functions in the interests of the People at large, and not under the influence or control of an interested individual. (*People* v. *Superior Court* (*Greer*), *supra*, 19 Cal.3d at p. 267.)

While the district attorney does have a duty of zealous advocacy, "both the accused and the public have a legitimate expectation that his zeal . . . will be born of objective and impartial consideration of each individual case." (*People* v. *Superior Court* (*Greer*), *supra*, 19 Cal.3d at p. 267.) "Of course, a prosecutor need not be disinterested on the issue whether a prospective defendant has committed the crime with which he is charged. If honestly convinced of the defendant's guilt, the prosecutor is free, indeed obliged, to be deeply interested in urging that view by any fair means. [Citation.] True disinterest on the issue of such a defendant's guilt is the domain of the judge and the jury—not the prosecutor. It is a bit easier to say what a disinterested prosecutor is not than what he is. He is not disinterested if he has, or is under the influence of others who have, an axe to grind against the defendant, as distinguished from the appropriate interest that members of society have in bringing a defendant to justice with respect to the crime with which he is charged." (*Wright* v. *United States* (2d Cir. 1984) 732 F.2d 1048, 1056.)

## II.  *Standards for Prosecutorial Recusal Under Section 1424*

Section 1424, pursuant to which the present motion was made, was enacted in 1980. Only three years earlier, in *People* v. *Superior Court* (*Greer*), *supra*, 19 Cal.3d 255 (hereinafter *Greer*), this court first recognized the judicial power to recuse the district attorney as prosecutor. In *Greer*, we located the source of a court's disqualification power in Code of Civil Procedure section 128, subdivision (a)(5), which recognizes a court's power " '[t]o control, in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it . . . .' " (*Greer*, *supra*, 19 Cal.3d at p. 261, fn. 4; accord, *People* ex rel. *Clancy* v. *Superior Court* (1985) 39 Cal.3d 740, 745 [218 Cal.Rptr. 24, 705 P.2d 347]; but see *People* v. *Hamilton* (1988) 46 Cal.3d 123, 139 [249 Cal.Rptr. 320, 756 P.2d 1348] [asserting *Greer* stated "common law principle"].) We further held the separation of powers doctrine did not preclude a trial court from disqualifying a district attorney. (*Greer*, *supra*, at pp. 262-265.)

In *Greer*, we expressed concern not only with actual conflicts of interest that might affect the evenhandedness with which a prosecutor exercised his

or her discretionary functions, but also with any " 'appearance of impropriety' " that might adversely affect " 'public . . . confidence in the integrity and impartiality of our system of criminal justice.' " (*Greer, supra,* 19 Cal.3d at p. 268.) We therefore held a district attorney could be disqualified "when [a] judge determines that the attorney suffers from a conflict of interest which might prejudice him against the accused and thereby affect, *or appear to affect,* his ability to impartially perform the discretionary functions of his office." (*Id.* at p. 269, fn. omitted; italics added.)

■ Section 1424 established both procedural and substantive requirements for a motion to disqualify the district attorney. Substantively, the statute provides the following standard: "The motion shall not be granted unless it is shown by the evidence that a conflict of interest exists such as would render it unlikely that the defendant would receive a fair trial."

"Section 1424 was the Legislature's response to *Greer* and other criminal cases stressing the importance of the appearance of impropriety and other 'apparent' conflicts as bases for prosecutorial disqualification." (*People* v. *Lopez* (1984) 155 Cal.App.3d 813, 824 [202 Cal.Rptr. 333].) The Legislature's response, however, was not as unequivocal as it might have been. As noted in *Lopez,* the statute refers simply to a "conflict of interest"; it does not explicitly require an "actual" conflict, nor does it explicitly exclude "apparent" conflicts. (*Ibid.*) On the other hand, the statute allows disqualification only when a conflict "render[s] it unlikely that the defendant would receive a fair trial," (§ 1424) whereas *Greer* allowed disqualification even when the conflict might merely "appear to affect" the prosecutor's fairness.[3]

We considered and resolved these interpretive questions regarding section 1424 in *People* v. *Conner, supra,* 34 Cal.3d 141 (hereinafter *Conner*). Recognizing the standard of section 1424 differed from that articulated in *Greer,* we nonetheless concluded that the statute "contemplates both 'actual' and 'apparent' conflict when the presence of either renders it unlikely that

---

[3]An earlier version of the bill adding section 1424 would have required the movant to show "an actual conflict of interest." (Sen. Amend. to Sen. Bill No. 1520 (1979-1980 Reg. Sess.) Apr. 10, 1980.) Before enactment, the language was changed to "a conflict of interest."

At the request of amicus curiae California District Attorneys Association, we take judicial notice of documents from the legislative history of Senate Bill No. 1520, which added section 1424. These documents indicate the bill was drafted and sponsored by the Attorney General in response to *Greer;* the Attorney General's office sought the measure as a means of reducing the number of disqualifications and thereby alleviating an increase in that office's disqualification workload. (Sen. Com. on Judiciary, Rep. on Sen. Bill No. 1520 (1979-1980 Reg. Sess.) as amended Apr. 10, 1980, pp. 1-3.) The Attorney General, in a letter sent to all members of the Senate before that body's passage of the bill, attributes the increase in disqualifications, in part, to *Greer*'s " 'appearance of conflict' " test. (Atty. Gen. letter to members of Sen., May 12, 1980.)

defendant will receive a fair trial." (34 Cal.3d at p. 147.) The distinction between actual and apparent conflict is "less crucial" under the statute, we explained, because of the "additional statutory requirement" that the conflict must "render it unlikely that the defendant would receive a fair trial." (*Ibid.*) We held that a "conflict," for purposes of section 1424, "exists whenever the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner. Thus, there is no need to determine whether a conflict is 'actual' or only gives an 'appearance' of conflict." (34 Cal.3d at p. 148.) But however the conflict is characterized, it warrants recusal only if "so grave as to render it unlikely that defendant will receive fair treatment during all portions of the criminal proceedings." (*Ibid.*)

*Conner* establishes that, whether the prosecutor's conflict is characterized as actual or only apparent, the potential for prejudice to the defendant—the likelihood that the defendant will not receive a fair trial—must be real, not merely apparent, and must rise to the level of a *likelihood* of unfairness. Thus section 1424, unlike the *Greer* standard, does not allow disqualification merely because the district attorney's further participation in the prosecution would be unseemly, would *appear* improper, or would tend to reduce public confidence in the impartiality and integrity of the criminal justice system. (Accord, *People* v. *McPartland* (1988) 198 Cal.App.3d 569, 574 [243 Cal.Rptr. 752] ["recusal cannot be warranted solely by how a case may appear to the public"]; *People* v. *Lopez, supra,* 155 Cal.App.3d at pp. 827-828.)[4]

Because the enactment of section 1424 eliminated the appearance of impropriety as an independent ground for prosecutorial disqualification, our review of the recusal order here must focus on whether Borland's payments created a conflict with the actual likelihood of prejudice to Eubanks and Wang, rather than on whether allowing such payments would, as defendants

---

[4]*People* v. *Hamilton, supra,* 46 Cal.3d 123, is not to the contrary. Our references there to recusal as a means of protecting "public confidence in the integrity and impartiality of the criminal justice system" (*id.* at p. 141) were in the application of the *Greer* standard, which had been exclusively applied by the parties and the court at Hamilton's trial. (*Id.* at p. 141, fn. 3.)

One should note, in this connection, the distinction between a motion to recuse the district attorney, under section 1424, and a motion to set aside the information or indictment, under section 995. In *Greer* we suggested that "if the trial court determines that a district attorney's participation in the filing of a criminal complaint or the preliminary hearing on that complaint created a potential for bias or the appearance of a conflict of interest, it may conclude that the defendant was not 'legally committed' within the meaning of Penal Code section 995, and the information should be set aside." (*Greer, supra,* 19 Cal.3d at p. 263, fn. 5.) We expressly reserve the question whether availability of a remedy under section 995 was affected by the addition of section 1424 and thus express no opinion here regarding what standard would govern motions brought under section 995.

assert, be "unseemly" or create "the perception of improper influence." That our analysis focuses on actual likelihood of prejudice, however, should not be taken as suggesting the potential for loss of public confidence in the criminal justice system is either unimportant or unimaginable. To the contrary, the practice of the district attorney here—soliciting and accepting the victim's underwriting of significant investigative costs—could, especially if replicated on a wide scale, raise an obvious question as to whether the wealth of the victim has an impermissible influence on the administration of justice. A system in which affluent victims, including prosperous corporations, were assured of prompt attention from the district attorney's office, while crimes against the poor went unprosecuted, would neither deserve nor receive the confidence of the public.[5] Even the appearance of such impropriety would be highly destructive of public trust. Under section 1424, however, such apprehensions, alone, are no longer a ground for recusal of the district attorney.

*Conner* clarified two other points of statutory interpretation important to the present case. First, by its terms, section 1424 allows recusal if the conflict of interest is so grave as to make a "fair trial" unlikely. The prosecutor's discretionary functions, however, are not limited to the trial proper, and we recognized in *Conner* that the need for prosecutorial impartiality extends to all portions of the proceedings, not only to the trial. Paraphrasing the statutory standard, we asked: "Was this conflict so grave as to render it unlikely that defendant will receive fair treatment *during all portions of the criminal proceedings?*" (*Conner, supra,* 34 Cal.3d at p. 148, italics added.) Consistently, in assessing the likelihood of prejudice, we referred to the conflict's effect on "the DA's *discretionary powers exercised either before or after trial* (e.g., plea bargaining or sentencing recommendations)." (*Id.* at p. 149, italics added; see also *People* v. *Lopez, supra,* 155 Cal.App.3d at p. 822 ["fair trial" in section 1424 broader than "miscarriage of justice" prejudice standard].)

Defendants here have focused on the likelihood of *pretrial* prejudice, in particular "the very real likelihood that the prosecution would pursue a weak case because it was indebted to Borland." They urge us to uphold the trial court's finding of conflict, which was based upon a perceived reasonable possibility the district attorney, out of a sense of obligation to Borland, would be unwilling to drop the charges or bargain for a lesser plea. *Conner*

---

[5]We do not suggest this is the current situation in Santa Cruz or any other county of California. Indeed, it has been argued that large corporations often have difficulty interesting local prosecutors, whose resources are already strained by the fight against violent crime, in the investigation and prosecution of business fraud and other complicated crimes against corporate victims. (See *International Business Machines Corp.* v. *Brown* (C.D.Cal. 1994) 857 F.Supp. 1384, 1388-1389.)

established that the potential for such pretrial unfairness is cognizable under section 1424.

Second, section 1424 requires the existence of a "conflict . . . such as would render" a fair trial "unlikely." In *Conner*, we read this language as establishing a two-part test: (i) is there a conflict of interest?; and (ii) is the conflict so severe as to disqualify the district attorney from acting? Thus, while a "conflict" exists whenever there is a "reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner," the conflict is disabling only if it is "so grave as to render it unlikely that defendant will receive fair treatment." (*Conner, supra,* 34 Cal.3d at p. 148.)[6] As shall be seen in part III.A., *post,* the trial court here erred by addressing only the first part of the test, existence of a conflict, without deciding whether the conflict was so grave as to make fair treatment unlikely.

III.  *Application to This Case*

A.  *Existence of a Conflict of Interest*

In *Conner, supra,* 34 Cal.3d at page 149, we stated the trial court's recusal decision was reviewable only to determine if it was supported by "substantial evidence." In *People v. Hamilton, supra,* 46 Cal.3d at page 140, we declared the standard was "abuse-of-discretion." ■ To the extent these assertions created any inconsistency, it was resolved in *People v. Breaux* (1991) 1 Cal.4th 281, 293-294 [3 Cal.Rptr.2d 81, 821 P.2d 585]: "Our role is to determine whether there is substantial evidence to support the [trial court's factual] findings [citing *Conners*], and, based on those findings, whether the trial court abused its discretion in denying the motion [citing *Hamilton*]." The same two-part standard applies to review of a trial court's grant ruling.

Although there were some conflicts in the recusal hearing testimony (e.g., Johnson and Leyton differed as to whether Leyton participated in discussion of who would pay Klausner's fee), the significant facts were largely undisputed. The trial court made no explicit findings on questions of evidentiary

[6]The legislative mandate that recusal not be ordered on a mere "possibility" of unfair treatment makes particularly compelling sense where, as here, what is at issue is the disqualification of the district attorney's entire office, rather than only one or a few deputies. "[W]hen the entire prosecutorial office of the district attorney is recused and the Attorney General is required to undertake the prosecution or employ a special prosecutor, the district attorney is prevented from carrying out the statutory duties of his elective office and, perhaps even more significantly, the residents of the county are deprived of the services of their [locally] elected representative in the prosecution of crime in the county." (*People* ex rel. *Younger v. Superior Court, supra,* 86 Cal.App.3d at p. 204.)

fact. Our review, then, is limited to determining if the superior court abused its discretion, while assuming the court relied on any substantial evidence that tends to support its ruling.

■ The discretion of a trial court is, of course, " 'subject to the limitations of legal principles governing the subject of its action.' " (*Westside Community for Independent Living, Inc.* v. *Obledo* (1983) 33 Cal.3d 348, 355 [188 Cal.Rptr. 873, 657 P.2d 365].) The Attorney General argues at length that financial contributions to the district attorney's office should not, as a matter of law, be considered as creating a conflicting interest for purposes of disqualification, because any interest of the district attorney in such contributions would be an *institutional*, rather than *personal*, interest. He emphasizes that Borland's payments "did not benefit any official's personal pocketbook," and contends the case law shows "recusal will usually require a showing of a prosecutor's personal interest in prosecution," or, stated differently, "a showing of personal or emotional involvement" on the part of the district attorney.

The Attorney General fails to persuade us any legal principle restricts the concept of a conflicting interest to a district attorney's personal financial or emotional stake in the prosecution. The cited cases in which recusal *has* been based on a prosecutor's personal involvement are not authority for a limiting rule.[7] As the Court of Appeal in the present case explained, "[p]ersonal interest or emotional involvement will have a particularly strong tendency to imply extraneous motivation. But it does not follow that *only* evidence of personal interest or emotional involvement will support a conclusion that there is 'a reasonable possibility that the [district attorney's] office may not exercise its discretionary function in an evenhanded manner.' (*People* v. *Conner, supra,* 34 Cal.3d at p. 148.)"

Section 1424, on its face, allows recusal on a showing of *any* conflict of interest that renders fair treatment unlikely, and our decisions interpreting the statute have not further restricted the concept of a conflicting interest. No reason is apparent why a public prosecutor's impartiality could not be impaired by institutional interests, as by personal ones. We have recognized the existence of such an impermissible conflict in a scheme that made the official budget of a public defender dependent on litigation decisions that

---

[7]The majority opinion in *People* v. *Superior Court (Martin)* (1979) 98 Cal.App.3d 515, 521-522 [159 Cal.Rptr. 625], a decision predating the enactment of section 1424, could be read as requiring a conflicting personal interest for recusal. The majority in that case, however, also found the defendant's claim of conflict "devoid of substance" (98 Cal.App.3d at p. 520), and Justice Grodin, in his concurring opinion, pointed out that the defendant had not suggested "any plausible scenario for conflict that would operate to his detriment." (*Id.* at p. 522.)

also affected the interests of the defender's clients (*People* v. *Barboza* (1981) 29 Cal.3d 375, 380 [173 Cal.Rptr. 458, 627 P.2d 188]); in some circumstances, the same might be true of prosecutors. For example, a scheme that provides monetary rewards to a prosecutorial office might carry the potential impermissibly to skew a prosecutor's exercise of the charging and plea bargaining functions. (Cf. *Marshall* v. *Jerrico, Inc.* (1980) 446 U.S. 238, 250 [64 L.Ed.2d 182, 193, 100 S.Ct. 1610] [return of penalties to prosecuting office held permissible, where budgeting system guarantees there is no "realistic possibility" the prosecuting officer will be influenced by "the prospect of institutional gain"].)

More to the present point, a prosecutor may have a conflict if institutional arrangements link the prosecutor too closely to a private party, for example a victim, who in turn has a personal interest in the defendant's prosecution and conviction. As Judge Friendly put it in *Wright* v. *United States, supra,* 732 F.2d at page 1056, a prosecutor "is not disinterested if he has, *or is under the influence of others who have,* an axe to grind against the defendant." (Italics added.) The tie that binds the prosecutor to an interested person may be compelling though it derives from the prosecutor's institutional objectives or obligations. Thus, in *Young* v. *U.S.* ex rel. *Vuitton et Fils S. A.* (1987) 481 U.S. 787 [95 L.Ed.2d 740, 107 S.Ct. 2124], the high court, pursuant to its supervisory authority, forbade a private law firm from prosecuting a contempt proceeding on behalf of the Government, because the firm, as a matter of legal ethics, bore the "obligation of undivided loyalty" to its private client, Vuitton, which in turn had a private pecuniary interest in the prosecution. (*Id.* at p. 805 [95 L.Ed.2d at p. 757].) A public prosecutor must not be in a position of "attempting at once to serve two masters," the People at large and a private person or entity with its own particular interests in the prosecution. (*Ganger* v. *Peyton* (4th Cir. 1967) 379 F.2d 709, 714.)[8] Private influence, exercised through control over the prosecutor's personal *or* institutional concerns, is a conflict of interest, under section 1424, if it creates a reasonable possibility the prosecutor may not act in an evenhanded manner.

---

[8]In *Ganger*, the federal court vacated a Virginia assault conviction on due process grounds because the prosecuting attorney, while prosecuting Ganger criminally, also represented Ganger's wife in a divorce action, which was based on the same alleged assault. A number of cases have followed *Ganger* in holding due process forbids prosecutors from holding such conflicting interests. (See, e.g., *State of N.J.* v. *Imperiale* (D.N.J. 1991) 773 F.Supp. 747, 751-756; *People* v. *Zimmer* (1980) 51 N.Y.2d 390 [434 N.Y.S.2d 206, 414 N.E.2d 705, 708]; *Cantrell* v. *Com.* (1985) 229 Va. 387 [329 S.E.2d 22, 25-27].) Although defendants cite *Ganger* and other such cases, and make reference to due process in their brief, they sought recusal solely on the authority of section 1424. Nor do their citations of constitutional authority suggest that a disabling conflict of interest would be more easily shown under constitutional principles than under section 1424. For those reasons, and because we conclude the trial court did not err in finding a conflict under the statutory standard, we need not reach any constitutional question here.

Nor are we persuaded that Borland's contributions bore no potential for cognizable prejudice because, as argued by amicus curiae California District Attorneys Association (CDAA), "[u]nequal treatment of victims, to the extent it exists, is a political necessity created by inadequate tax revenues, and there is no misconduct by the district attorney in reacting to such necessity in the way he deems most beneficial to the community." True, district attorneys must, of necessity, factor budgetary considerations into their exercise of prosecutorial discretion. A district attorney is not disqualified simply because, in an effort to overcome budgetary restraints, he or she has accepted assistance from the public in investigating or prosecuting a crime. At the same time, however, the courts, the public and individual defendants are entitled to rest assured that the public prosecutor's discretionary choices will be unaffected by private interests, and will be "born of objective and impartial consideration of each individual case." (*Greer, supra,* 19 Cal.3d at p. 267.)

In this connection, CDAA draws our attention to statutes establishing industry-financed funding schemes for certain types of fraud prosecutions. Insurance Code section 1872.8, subdivision (a), assesses automobile insurers up to $1 per insured vehicle per year, and allocates 51 percent of the resulting funds for distribution to district attorneys for investigation and prosecution of automobile insurance fraud cases. Insurance Code section 1872.83 establishes a similar funding scheme for workers' compensation fraud investigation and prosecution. CDAA asserts these statutes serve to demonstrate "it is . . . appropriate as a matter of policy to request victims to pay some prosecution related costs." Without expressing any opinion as to whether these financing schemes may cause a conflict for district attorneys, or as to their desirability from a policy standpoint, we agree with defendants that these statutory schemes are distinguishable in a number of ways from the type of contributions at issue here: The insurers involved in the statutory funding schemes are required by law to contribute to prosecution efforts, unlike Borland, which contributed to the prosecution at the special request of the district attorney's office; and the assessments are made industry-wide, rather than on one particular victim corporation, and are spent on investigation and prosecution of automobile and workers' compensation insurance fraud generally, rather than for the particular benefit of any one victim. These factors tend to reduce the likelihood any victim would gain, through financial contributions, influence over the conduct of any particular prosecution.

The Attorney General also maintains Borland's assistance to the district attorney bore no potential for improper influence because it was, in the Court of Appeal's words, "comparable to the cooperation victims often give to prosecutors in criminal cases." We disagree. True, ordinary cooperation

with police and prosecutors may impose financial costs on the victim; the need to attend interviews, lineups and court proceedings, for example, may cause an individual complainant to lose earnings or a corporate complainant to lose production. Beyond such routine cooperation, victims of commercial and corporate crimes sometimes assist the prosecution by collecting and organizing necessary information from internal sources, and may even hire private investigators for external investigation of suspected crimes against the company. None of these common practices, however, include the district attorney's solicitation and acceptance of financial assistance to satisfy an already incurred obligation.

In summary, we conclude financial assistance of the sort received here may create a legally cognizable conflict of interest for the prosecutor. The undisputed facts, moreover, support the trial court's conclusion such a conflict did exist in this case. The district attorney incurred a debt of $9,450 to an independent contractor, Strawn, for technical assistance in a criminal investigation. The debt was, as the deputy district attorney who argued the motion conceded, "substantial considering our resources." Certainly the amount is not de minimis. (Cf. *State* v. *Retzlaff* (1992) 171 Wis.2d 99 [490 N.W.2d 750, 751-753] [theft victim's $300 campaign contribution to the district attorney did not require the district attorney's disqualification from prosecution of the alleged thief].) The district attorney then asked the victim of the alleged crime, Borland, to pay the debt. Borland did so, paying as well other significant costs of the investigation. The trial court did not err in concluding these circumstances evidenced a "reasonable possibility" the prosecutor might not exercise his discretionary functions in an evenhanded manner.

We must agree, however, with the Court of Appeal that the trial court failed to apply the second part of the *Connor* test for disqualification: whether the conflict is so grave as to make fair treatment of the defendant unlikely if the district attorney is not recused. In the absence of contrary evidence, we assume a trial court applied the correct legal standard. (*Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 913-914 [141 Cal.Rptr. 133, 569 P.2d 727].) Here, however, there is ample evidence the trial court failed to apply the complete test under section 1424. The court's oral remarks at the recusal hearing, which are the only record of the court's reasoning, are directed solely at the first portion of the two-part test established by section 1424 and *Conner*. The court repeatedly stated the standard as a "reasonable possibility" of unfairness to defendants—*Conner*'s definition of a conflict—and nowhere addressed whether the conflict was so grave as to render fair treatment unlikely. The trial court thus determined only that, under the test enunciated in *Connor*, the Santa Cruz County District Attorney suffered

from a conflict of interest in his prosecution of Eubanks and Wang, and never addressed whether that conflict was, under the proper standard, disabling. We proceed to consider whether, as the Court of Appeal held, a finding of disabling conflict would, on this record, be an abuse of discretion under the standard established by section 1424.

### B. *Gravity of the Conflict*

As previously explained, the trial court detected a potential for unfair treatment in the possible sense of obligation the district attorney would feel for Borland's payment of a debt owed by the district attorney's office. The court elaborated on the potential prejudice as follows: "[L]et's assume that the District Attorney's office, in the review of their case . . . ultimately conclude that, 'Well, you know, maybe our case isn't as strong as we thought at the inception.' Would they be—would it be easier for them to tell a victim who paid no money to the D.A.'s office, 'You don't have a case,' than it would be one that you received $15,000 [*sic*] from?"

The trial court correctly focused on the potential bias arising out of a sense of obligation to Borland, rather than on any potential "prejudice" to be found in the fact of investigatory assistance itself. That the prosecutor may have been *able* to proceed further or more quickly against defendants with Borland's assistance than without would not, by itself, constitute unfair treatment. As CDAA points out, defendants have "no right to expect that crimes should go unpunished for lack of public funds." (See *Wright* v. *United States*, *supra*, 732 F.2d at p. 1057 [prejudice from asserted prosecutorial bias not shown by hypothesis that, if a different prosecutor had been appointed, the defendant "might not have been indicted for a crime which, as the jury's verdict demonstrates, he had in fact committed."].) For that reason we cannot agree with the suggestion of amicus curiae National Association of Criminal Defense Lawyers that a victim's financial assistance *necessarily* subjects the defendant to unfair prosecutorial treatment because "[w]hen a private party underwrites the cost of one particular prosecution, that case is not subject to the same economic restraints that limit all other prosecutions." To warrant recusal of the district attorney under section 1424, instead, the evidence must show the prosecutor suffers from a disabling conflict of interest. Such a conflict is demonstrated, in this factual context, only by a showing the private financial contributions are of a nature and magnitude likely to put the prosecutor's discretionary decisionmaking within the influence or control of an interested party. In each case, the trial court must consider the entire complex of facts surrounding the conflict to determine whether the conflict makes fair and impartial treatment of the defendant unlikely.

Supporting recusal here is the fact the largest payment, that for Strawn's first $9,450 bill, was, as the trial court emphasized, "payment of money for a debt already incurred" by the district attorney. The final decision to obtain payment from Borland was not made until Strawn submitted his first bill. Because Strawn had contracted with the district attorney's office, rather than Borland, Chief Inspector Johnson reasonably believed the district attorney's office would be responsible for Strawn's bills if Borland did not pay them. Borland paid Strawn's bill, moreover, in response to a direct request from the district attorney's office. While decisions from other jurisdictions have approved of some forms of victim assistance, for example in the form of an attorney hired by a victim or victim's family to assist the public prosecutor (see, e.g., *Powers* v. *Hauck* (5th Cir. 1968) 399 F.2d 322, 324; *Rutledge* v. *State* (1980) 245 Ga. 768 [267 S.E.2d 199, 200]; *State* v. *Riser* (1982) 170 W.Va 473 [294 S.E.2d 461, 464]), none involved the public prosecutor's request for the victim's assistance to satisfy a monetary debt already incurred. Hence, none assist our analysis here.

The size of the contributions here also tends to show recusal would be within the trial court's discretion. District Attorney Danner testified his office fund for this type of investigation was very limited, and Chief Inspector Johnson apparently regarded the investigatory costs here as large enough to warrant the unusual measure of asking the victim to pay.them.

Finally, the trial court's assessment of the strength of the prosecution case supports the decision to recuse. Before hearing the recusal motion, the court held an extensive hearing on the proper means of protecting Borland's asserted trade secrets from disclosure during the criminal proceedings. (See Evid. Code, §§ 1060-1063.) In the course of that hearing, the court repeatedly stated its firm impression that the subject secrets, which Wang and Eubanks were alleged to have conspired to steal, Wang to have stolen and Eubanks to have received, do not in fact meet the definition of trade secrets for criminal purposes (Pen. Code, § 499c, subd. (a)(9)), although they might be trade secrets for purposes of civil remedies (Civ. Code, § 3426.1, subd. (d)).[9] Arguably, a factually weak case is more subject than a strong case to influence by extraneous financial considerations, since in the absence of financial assistance from the victim the prosecutor is more likely to abandon or plea bargain such a case.

Considering the above factors, we cannot say, as a matter of law, that had the trial court addressed the second part of the *Conner* test—the gravity of

[9]The Attorney General observes, correctly, that the trial court's comments "are not *evidence* of weakness in the case." We do not suggest they are, and express no view as to the actual strength or weakness of the prosecution's case. The trial court's comments are significant only in that they tend to show that court's own preliminary assessment of the case, an assessment the court may properly take into account in making its discretionary decision on recusal.

the identified conflict—it would have abused its discretion in finding the conflict so grave as to render fair treatment of the defendants in all stages of the criminal proceedings unlikely. The Court of Appeal therefore erred in holding that, assuming a conflict existed, it was not, as a matter of law, grave enough to justify recusal.

## DISPOSITION

The cause is transferred to the Court of Appeal with directions to vacate its previous judgment and dismiss the appeal as moot.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Chin, J., and Brown, J., concurred.

**GEORGE, C. J.,** Concurring.—I have signed the majority opinion, and write separately simply to explain that, on these facts, I believe—apart from any general concerns I may have about privately funded public prosecutions —recusal of the district attorney's office was required as a matter of law.

As the majority holds, the trial court correctly found that the prosecutor suffered a "conflict of interest" under Penal Code section 1424—i.e., there was "a reasonable possibility that the [district attorney's] office may not exercise its discretionary function in an evenhanded manner" (*People* v. *Conner* (1983) 34 Cal.3d 141, 148 [193 Cal.Rptr. 148, 666 P.2d 5] [construing Pen. Code, § 1424].) The majority then addresses the remaining question—whether recusal of the district attorney's office was required because the conflict made it "unlikely that the defendant would receive a fair trial." (Pen. Code, § 1424.)

As this court said in *Conner*, determination of that question calls for an inquiry as to whether the conflict is "so grave as to render it *unlikely* that defendant *will receive fair treatment* during all portions of the criminal proceedings." (*People* v. *Conner*, *supra*, 34 Cal.3d at p. 148, italics added.) The majority concludes, correctly, that on these facts the trial court would not have abused its discretion had it concluded that fair treatment of defendants was unlikely. I would stress that under the circumstances here presented, the trial court properly could not have exercised its discretion *otherwise*.

I

As the majority acknowledges, the relevant facts are as follows: (i) The district attorney solicited the alleged crime victim to pay approximately

$13,000 incurred by the district attorney's office in connection with that office's investigation of the case; (ii) a deputy district attorney testified that the debt owed by the office was "substantial" in view of the office's limited resources; and (iii) the trial court assessed the evidentiary support for the criminal trade secret charges against defendants as extremely weak. Certainly, as the majority concludes, all three circumstances "support" recusal under Penal Code section 1424. As explained below, and contrary to the arguments advanced by the Attorney General on behalf of the district attorney, and relied upon by the Court of Appeal herein, these circumstances also *mandate* recusal under the statute.

First, the circumstance that the district attorney *solicited* Borland International to pay the debt incurred by the district attorney rendered it problematic, if not unlikely, that the district attorney would be able to exercise objectively his prosecutorial discretion. As the trial court observed, it would be quite difficult for the district attorney to tell Borland that he has decided not to prosecute Borland's case, after *Borland, at the district attorney's request*, agreed to pay substantial bills that were submitted to, and that were the responsibility of, the district attorney's office. Accordingly, this was not, as the Attorney General asserts, merely an example of normal "cooperation by a victim corporation." Instead, the *solicited* contributions here at issue are of a different order and pose a far greater risk of improperly influencing the district attorney's exercise of charging and prosecuting discretion.

Second, as the majority acknowledges, the size of the solicited contributions increased the likelihood that defendants would not receive fair treatment. The district attorney testified that the office fund for this type of investigation was very limited, and the chief inspector "apparently regarded the investigatory costs here as large enough to warrant the unusual measure of asking the victim to pay them." (Maj. opn., *ante*, at p. 600.) As was conceded by the deputy district attorney who argued the recusal motion, "[t]he sum of money that Borland paid in the [district attorney] universe is substantial considering our resources."

Certainly, the district attorney would have appreciated that Borland stood to benefit from the criminal prosecution of defendants. Not only would such a prosecution assist Borland's parallel civil action, help protect any asserted trade secrets, and serve to deter others from committing similar acts in the future, but prosecution also would constitute a major disruption and distraction for Symantec Corporation, one of Borland's primary competitors. Under these circumstances, the solicited funds likely would be considered by Borland to be a prudent investment whether or not the prosecution ultimately was pursued to trial and conviction because, by keeping the prosecution

"alive a little longer," Borland would benefit competitively vis-à-vis Symantec. Thus, the district attorney could "reimburse" Borland for paying the incurred debt simply by exercising discretion to continue or extend the criminal investigation for longer than it otherwise would. As the opinion observes (maj. opn., *ante*, at p. 584, fn. 2), the district attorney maintained the charges against defendants until shortly after oral argument in this court, despite the apparent weakness of the case.

Under these circumstances, the district attorney—knowing the strategic importance of the matter to Borland, and having asked Borland to pay the district attorney's obligations—likely would feel a great sense of obligation to pursue the prosecution and would be reluctant to exercise objectively his prosecutorial discretion. This further increased the risk that defendants would not receive the fair, impartial treatment that other defendants would obtain in a similar situation.

The Court of Appeal concluded otherwise, reasoning that an amount of money significant to a tightly budgeted public office is not necessarily large in the eyes of a successful for-profit corporation, and that, as the deputy district attorney arguing the motion put it, "the sum of money that Borland paid in the Borland universe is not great." Even if true, the district attorney's observation is of debatable relevance. The question is whether the size of the solicited contributions was sufficient to create a likelihood of unfairness to defendants arising from the alleged victim's undue influence *on the district attorney's* discretionary authority. It matters little that the $13,000 solicited funds might be "small potatoes" in Borland's eyes; the issue is the likely influence of such a payment upon the financially strapped public prosecutor in his treatment of the criminal investigation and continued prosecution of defendants.

Finally, as alluded to by the majority, the trial court made clear its "firm impression that the subject secrets . . . *do not in fact meet the definition of trade secrets for criminal purposes* [citation], although they might be trade secrets for purposes of civil remedies [citation]." (Maj. opn., *ante*, at p. 600.) On the final two days of an eight-day pretrial hearing on Borland's request for a trade-secret protective order (Evid. Code, § 1061), the trial court asserted: "I don't have criminal trade secrets here in my opinion at all, and—from what I've seen, . . . I'm not sure why this case is here." Later, the court stated, "I don't see criminal trade secrets here." Finally, the court repeated, "it's this Court's view that there's not a criminal trade secret involved. And there isn't, gentlemen. I still say it to you. I don't know what we're doing here . . . ."

As the majority observes (maj. opn., *ante*, at p. 600, fn. 9), the trial court's statements reflect clearly the trial court's considered assessment that the

prosecution's case was factually weak. (See also maj. opn., *ante*, at p. 600.) Contrary to the Attorney General's suggestions, it is appropriate for an appellate court to take into account the trial court's assessment that the prosecution's case is weak, in determining whether the trial court would have abused its discretion had it denied the recusal motion.

## II

I agree with the majority that the trial court would not have erred had it properly applied Penal Code section 1424 and granted defendants' recusal motion. Indeed, the trial court would have erred had it ruled otherwise. In light of (i) the circumstance that the contributions were solicited to satisfy obligations of the district attorney, (ii) the size of the contributions in relation to the budget of the district attorney's office, and (iii) the trial court's clearly expressed and considered assessment that the prosecution's case was weak, I conclude that the trial court would have abused its discretion had it denied the motion to recuse.

Mosk, J., concurred.

Appellant's petition for a rehearing was denied February 26, 1997, and the opinion was modified to read as printed above.