Filed 1/25/23  P. v. Herrera CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G061101 |
| v. | (Super. Ct. No. 18CF3361) |
| JESUS SEGURA HERRERA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Kimberly Menninger, Judge.  Affirmed.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Jesus Segura Herrera (Herrera) appeals from the judgment following his conviction on several charges, including second degree murder. Herrera argues his conviction must be reversed because (1) the prosecutor misstated the quantum of evidence necessary to demonstrate he acted with implied malice, and (2) the trial court erred by refusing to instruct the jury on gross vehicular manslaughter as a lesser charge. We disagree and affirm the judgment.

**FACTS**

This case arises out of a fatal traffic collision. The victims, Jorge C. and Alfredo G., were passengers in a car driven by Claudia A., who had picked them up from a bar. She stopped for a traffic light at the corner of McFadden and Grand Avenues; after the light changed to green, she began to pull forward when her car was struck from behind by a car driven by Herrera. The impact caused both cars to spin. Jorge C., who was in the back seat, suffered an internal decapitation from the impact and died. When the paramedics arrived, they had to remove the roof of Claudia's car in order to access Jorge C. Alfredo G., who was in the front passenger seat, suffered fractures to his ribs, spine, and neck.

Following the impact, Herrera got out of his car and a bystander, fearing he was going to flee, yelled, "[d]on't do it." Herrera got back into his car and although another bystander told him to sit on the curb, he revved his engine, began to drive away, and hit a light pole. Several bystanders then dragged Herrera out of the car; one noticed the smell of alcohol on his breath. Herrera identified himself and then appeared to start convulsing. He was treated at the scene and was able to answer questions. He admitted to a Santa Ana police officer that he had been drinking, but said he did not remember how the accident occurred.

The officer noted that Herrera's speech was slurred, his eyes were red and watery, and he had an odor of alcohol on his breath. The officer found cold beer bottles,

2

both opened and unopened, on the passenger seat floor of Herrera's car. The officer concluded Herrera was under the influence of alcohol and impaired for purposes of driving.

Another officer inventoried the contents of Herrera's car at the scene and found three beer bottle caps on the front passenger seat, an empty beer can under the front passenger seat, a broken beer bottle, two empty beer bottles, and several unopened beer bottles on the passenger side, as well as a cardboard box carrier for beer bottles behind the front passenger seat.

That second officer also interviewed Herrera, who admitted to having had six beers at a company party in Anaheim. Herrera initially stated that after the party, he went home, and claimed he did not remember what happened after he got home. He then recalled going to a bar to dance at about 11:30 p.m. or midnight. Herrera claimed he'd had only one beer and left the bar with his wife, who drove. He later remembered buying a bucket of beers at the bar and admitted drinking three of them. He did not recall going anywhere after he got home with his wife, but acknowledged he must have driven somewhere because his wife was not with him.

Herrera admitted to the officer that he should not have been driving after drinking nine beers, and he acknowledged he had been a "dumbass." He also admitted he had previously been convicted of driving under the influence, but claimed he did not remember anything specific the judge told him at the time of the plea. Herrera was required to take a nine-month alcohol education course as a consequence of his prior conviction during which he had been warned of the consequences of drinking and driving. When asked to summarize what he had learned, Herrera wrote: "If I continue driving under the affects [*sic*] of alcohol or drugs or both . . . I may be accused of murder."

3

The information charged Herrera with the murder of Jorge C. (Pen. Code,[1] § 187, subd. (a) (count 1)); driving under the influence of alcohol and causing bodily injury to Alfredo G. (Veh. Code, §§ 23153, subd. (a), 22350 (count 2)); driving with a blood alcohol level of 0.08 percent or more, causing bodily injury to Alfredo G. (Veh. Code, § 23153, subd. (b) (count 3)); committing a hit and run causing permanent bodily injury or death to Jorge C. and Alfredo G. (Veh. Code, § 20001, subds. (a)-(b)(2) (count 4)). The information also alleged as to counts 2 and 3 that Herrera personally inflicted great bodily injury on Alfredo G. (§§ 1192.8 subd. (a), 12022.7, subd. (a)).

The jury convicted Herrera on all counts and found all special allegations true. In 2022, the court sentenced Herrera to 15 years to life as to count 1, and imposed a concurrent sentence of two years as to count 2, plus a consecutive sentence of three years for the great bodily injury allegation. The court stayed the sentence for count 3, pursuant to section 654 and imposed a concurrent term of two years for count 4.

## DISCUSSION

1. *Implied Malice Murder*

Herrera was convicted of a second degree murder under an implied malice theory. "Malice is implied when the killing is proximately caused by '"an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life."'" (*People v. Knoller* (2007) 41 Cal.4th 139, 152.)

Implied malice murder arising out of drunk driving is now colloquially known as a "*Watson* murder" after *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*). (*People v. Wolfe* (2018) 20 Cal.App.5th 673, 677.)

---

[1] All subsequent statutory references are to the Penal Code unless otherwise noted.

4

In *Watson*, the court held the defendant could be found to have acted with implied malice while driving under the influence. (*Watson, supra*, 30 Cal.3d at pp. 293, 300.) The court explained, "Defendant had consumed enough alcohol to raise his blood alcohol content to a level which would support a finding that he was legally intoxicated. He had driven his car to the establishment where he had been drinking, and he must have known that he would have to drive it later. It also may be presumed that defendant was aware of the hazards of driving while intoxicated. . . . Defendant drove at highly excessive speeds through city streets, an act presenting a great risk of harm or death. Defendant nearly collided with a vehicle after running a red light; he avoided the accident only by skidding to a stop. He thereafter resumed his excessive speed before colliding with the victims' car, and then belatedly again attempted to brake his car before the collision (as evidenced by the extensive skid marks before and after impact) suggesting an actual awareness of the great risk of harm which he had created. In combination, these facts reasonably and readily support a conclusion that defendant acted wantonly and with a conscious disregard for human life." (*Id.* at pp. 300-301.)

Second degree murder arising out of intoxicated driving is not an aggravated form of gross vehicular manslaughter. It is a distinct crime based on distinct elements. In contrast to the subjective state of mind required for an implied malice murder,[2] the various types of vehicular manslaughter are based on a determination the defendant acted with some degree of negligence—an objective standard that evaluates conduct, rather than consciousness. This distinction is evidenced by CALCRIM No. 590, which defines criminal gross negligence and requires a finding that "[a] reasonable

---

[2]    CALCRIM No. 520, the instruction for second degree murder, states the crime requires a finding that the defendant "knew" his or her act was dangerous to human life, and that he or she acted with a "conscious disregard" for that danger.

person" would have known that acting as the defendant did would create a high risk of death or great bodily injury.

2.      *Prosecutor's Argument*

Herrera argues that the prosecutor misstated the law applicable to implied malice murder during closing argument and thus improperly lessened the burden of proof on the element of conscious disregard.

Specifically, Herrera points to a passage in the prosecutor's rebuttal argument when the prosecutor stated that Herrera "got the warnings over, and over, and over again.  That is a conscious disregard for human life.  When you are told the risks, and you were told that you can be charged with murder, and you get to a .24, or anywhere above a .08, and you go out and kill somebody you are on notice, and you've demonstrated all the elements of implied malice murder."

Herrera's argument appears to focus on the first two sentences of the quoted passage, in which the prosecutor seems to equate the warnings Herrera received with a finding of conscious disregard.  Herrera contends "[t]his erroneous statement lessened the burden of proof by reducing the quantum of evidence required to prove conscious disregard to the fact of a prior conviction and the issuance of a *Watson* warning."  He claims that "[w]hile such evidence is relevant to prove a defendant's subjective awareness of the risk, it does not suffice as proof that a defendant *acted* with conscious disregard."

Herrera has a point.  "Conscious disregard" has two aspects, i.e., that the defendant (1) was subjectively aware of a danger, and (2) acted despite the known danger.  Evidence that the defendant was warned about the danger would support the first aspect, but does not address the latter.

Indeed, the Attorney General concedes that "the warnings, in and of themselves, were not conclusive proof of conscious disregard for human life.  Rather, proof of conscious disregard for human life is based on the totality of the circumstances

6

surrounding the offense, *including* any prior warning or advisements." In other words, a determination of conscious disregard is not just an evaluation of what the defendant knows, but also how he acts in relation to that knowledge. Herrera's claim fails nonetheless.

When a claim of prosecutorial misconduct "focuses upon comments made by the prosecutor before the jury, the question [of the comments' prejudicial impact] is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) Here, the one sentence Herrera focuses on was hardly the prosecutor's whole argument. The passage is a small part of the prosecutor's rebuttal argument, which itself was a response to the closing argument made by Herrera's counsel.

And the prosecutor's initial closing argument addressed the elements of the implied malice issue in painstaking detail, including the meaning of conscious disregard. His analysis made clear that the assessment of conscious disregard included a consideration not only of what Herrera knew, but also how he acted: "So what is deliberately acted with conscious disregard? Deliberately acted. Acted on purpose. Not accidental. He got behind the wheel after drinking and driving. Nobody forced him. It wasn't oopsie. He didn't trip and fall. He was not, it was not an accident, okay. [¶] He got behind the wheel knowing the risks associated with drinking and driving, and the worst possible consequence occurred. So he deliberately acted. Nobody forced him to drink. Nobody forced him to get behind the wheel. Conscious. Aware. So he's aware of the risk associated, Okay. [¶] Disregard. He ignored. So he deliberately acted with conscious disregard for human life. This also goes back to the fact that during that warning he knew the risks and he was told about how extremely dangerous it was to human life to get behind the wheel, and he did it anyways."

7

The prosecutor's rebuttal included his effort to explain again how the evidence fit into the elements of the crimes charged. The prosecutor had gotten to "Element 4, 'He deliberately acted with conscious disregard for human life.'" He first reminded the jury "we talked about the act, which you already know what it is, it's driving. We talked about all the things he chose to do." And then, after addressing Herrera's actions, the prosecutor argued "you remember from the warnings, he is repeatedly told 'extremely dangerous to human life, extremely dangerous to human life' when he went to his class and received the *Watson* advisements." It was after discussing those facts, that the prosecutor reiterated "*he got the warnings over, and over, and over again. That is a conscious disregard for human life.*" (Italics added.)

We do not believe the jury might have interpreted the two sentences highlighted by Herrera as an effort to convince them that the warnings he was given in connection with his earlier conviction were sufficient, standing alone, to prove the conscious disregard element. Further, as Herrera acknowledges, when his trial counsel objected to the prosecutor's rebuttal statement as "[m]isstat[ing] the law," the court responded by reminding the jurors that "if anything the attorneys say is different from the law, the law does control." And the implied malice jury instruction given in this case informed the jurors that a finding of implied malice required a determination that "[a]*t the time he acted*, he knew his act was dangerous to human life" and that he "deliberately *acted* with conscious disregard for human life." (Italics added.) Those instructions echo the analysis offered by the prosecutor in his initial argument, and they reinforce his point that an evaluation of conscious disregard involves a consideration of both what the defendant subjectively knew and how he acted.

### 3. *Failure to Instruct*

Herrera also argues that the court erred by failing to instruct the jury on the lesser charge of gross vehicular manslaughter. In making that argument, Herrera acknowledges that "based on the current state of the law," the court had neither a duty

8

nor the discretion to instruct on that charge because it is not a lesser included offense of second degree murder. (*People v. Birks* (1998) 19 Cal.4th 108, 113; see *People v. Sanchez* (2001) 24 Cal.4th 983, 992 (*Sanchez*) ["Gross vehicular manslaughter while intoxicated, as we have noted, is not simply a degree of murder. Although it generally is true that manslaughter is a lesser included offense of murder, because generally manslaughter simply involves an unlawful killing of a human being without malice, gross vehicular manslaughter while intoxicated—like assault with a deadly weapon—requires proof of *additional elements* that are not included in the offense of murder or in other forms of nonvehicular manslaughter"].)

While the court has a duty to instruct on lesser *included* offenses (*People v. Breverman* (1998) 19 Cal.4th 142, 168-169), it is well settled that "there is no federal constitutional right of a defendant to compel the giving of lesser-related-offense instructions" (*People v. Rundle* (2008) 43 Cal.4th 76, 147-148, disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see *United States v. Armstrong* (1996) 517 U.S. 456, 464, "[i]n the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion'"]).

Instead, discretion remains with the prosecutor to decide which related charges to bring against a defendant. (*People v. Eubanks* (1996) 14 Cal.4th 580, 589 ["'The district attorney's discretionary functions extend . . . through the crucial decisions of whom to charge and what charges to bring'"].)

Despite his acknowledgment of current law, Herrera asks us to "recommend" to our Supreme Court that it "reconsider its holding in *Sanchez* or fashion some remedy that narrowly allows the defense to obtain an instruction on vehicular manslaughter when the prosecution elects to file only a second degree murder charge" in

9

cases involving a motor vehicle death.  He bases this request on a lengthy policy argument.

We decline the invitation.  We find no error in the trial court's failure to instruct the jury on the crime of gross vehicular manslaughter.

## DISPOSITION

The judgment is affirmed.

GOETHALS, J.

WE CONCUR:

MOORE, ACTING P. J.

DELANEY, J.

10